Cory CHASE, Petitioner,

v.

**INDUSTRIAL COMMISSION OF UTAH; Hercules, Inc.; Workers' Compensation Fund; and Cigna Insurance Company, Respondents.**

No. 930271–CA.

Court of Appeals of Utah.

March 25, 1994.

Wayne A. Freestone (argued), Salt Lake City, for petitioner.

Steven J. Aeschbacher (argued), George S. Adondakis, Ray, Quinney & Nebeker, Sharon J. Eblen, Indus. Com'n of UT, Salt Lake City, for respondents.

Before BENCH, JACKSON and ORME, JJ.

## OPINION

ORME, Associate Presiding Judge:

Petitioner Cory Chase seeks review of an Industrial Commission order that overturned an administrative law judge's decision granting him workers' compensation benefits. We reverse the Commission's order and remand.

## FACTS

Chase began working for Hercules as a machinist in February of 1984. His job activities included running lathes, drill presses, and mills. Chase contends that repeating the tasks of a machinist, five to seven days per week over a seven-year period, with work-shifts occasionally lasting up to thirty-three consecutive hours, aggravated his preexisting shoulder condition.[1] It is undisputed that his job responsibilities were physically demanding and often involved considerable exertion of the arms and shoulders.

In March of 1988, Dr. Lonnie E. Paulos began treating Chase for his ongoing shoulder ailment. Following two and one-half years of intermittent treatment, Dr. Paulos performed orthoscopic surgery on Chase's shoulder in November of 1990.

After several follow-up examinations of Chase, Dr. Paulos wrote a letter to Hercules on January 14, 1991, regarding Chase's condition. This letter states that Chase "damaged his shoulder through his occupational duties and various sports activities." Fearing further damage to Chase's shoulder, Dr. Paulos recommended that Chase not resume his then-current job responsibilities or other duties that would require "aggressive" use of his shoulder.

In light of Dr. Paulos's recommendations, Hercules began working with Chase to change his job duties and accommodate his restrictions. To facilitate this objective, Hercules assigned a case management team to Chase. Included in the case management team were Alan Heal, a rehabilitation specialist, and Dr. Dick Johns, a physician employed by Hercules. After meeting several times to discuss job reassignment, the case management team prepared and issued a Safety Event Report. This report stated in part, with our emphasis: "On February 21, 1991, [Chase] reported to the clinic that during the previous November, 1990, he started experiencing nearly consistent shoulder pain. Possible job related causes were reviewed. It was determined that he was not performing job functions that would *cause* such an injury...." The report expressed no opinion on whether his employment tasks had materially worsened his shoulder condition.

However, Alan Heal's report, dated March 15, 1991, concluded that Chase could not resume the heavy machinist duties he had previously done and should be reassigned. The record also contains a report from Dr. Johns, who examined the job site and conducted ergonomic tests.[2] These tests were designed to measure the muscle force necessary to perform Chase's job functions and evaluate the corresponding risk of injury to an individual with a preexisting shoulder condition. The tests indicated that a person

---

1. Chase admits to having a preexisting shoulder injury. He has a history of pain in his right shoulder dating back seven or eight years. Over approximately the past twenty years, Chase avidly played competitive and recreational softball. It is undisputed that these athletic activities created a medical condition that predated the industrial injury in question.

2. Ergonomics is "an applied science concerned with designing and arranging things people use so that the people and things interact most efficiently and safely." *Webster's Collegiate Dictionary* 393 (10th ed. 1993).

performing tasks identical to those that Chase performed would be subjected to considerable shoulder stress, and an individual repeatedly performing such tasks risked aggravating a preexisting shoulder condition.[3]

Chase was eventually assigned an office position that required only the minimal physical exertion associated with typing and writing. However, Chase was laid off from his employment at Hercules in November of 1991. On February 26, 1992, Chase filed the claim at issue in this appeal with the Commission. He sought medical and temporary total disability benefits for the period of November 13, 1990, to January 7, 1991, corresponding to the period of his surgery and recuperation.

Dr. Johns submitted his medical causation opinion to the Commission in a letter dated April 1, 1992, in which he stated that the applicant's "intermittent upper extremity work as a machinist at Hercules would not have caused his right shoulder impingement syndrome." Dr. Johns went on to add: "It appears more medically plausible that for his age, baseball and perhaps other intensive recreational activities are more likely to have caused this condition." Dr. Johns did not comment on whether Chase's work activities aggravated his shoulder condition. Chase testified, without contradiction, that he was never examined by Dr. Johns.

In contrast, as his treating physician, Dr. Paulos examined Chase on several occasions. Between April of 1991 and March of 1992, Chase visited Dr. Paulos on three separate occasions for post-surgery examinations and follow-up care.

On September 1, 1992, Dr. Paulos wrote a letter to the Commission clarifying his medical causation opinion, in which he stated:

I have thoroughly reviewed the above referenced patient's chart and find that his shoulder problem was mainly caused from sports activities. In fact at the time of his first visit to our Clinic he was specifically asked if this was a work related problem and he responded in the negative. However, in thorough questioning we did find that the type of work activities he performed aggravated the shoulder as did the sports activities. It is possible that his work did thus aggravate the problem along with the sports activities but I feel safe in stating that it did not cause the problem originally. In fact, the patient stated to us that he had suffered a baseball injury 2 years before presenting to us which he felt was the inciting incident.

On September 4, 1992, Dr. Paulos submitted an additional letter explaining his September 1 letter, which states in part:

Our records reveal that the patient presented to us with shoulder soreness when throwing in softball. After a thorough questioning we also found out that the patient's work functions aggravated the shoulder as well. We *cannot* determine which was the worst of the aggravating problems—both contributed equally.

After a hearing and review of the medical records, the administrative law judge found that Chase had established by a preponderance of the evidence that his job-related activities aggravated his preexisting condition and were therefore causally connected to his disability. The ALJ concluded that Chase's shoulder injury was aggravated by his work

---

**3.** Dr. Johns's tests revealed, in his words, as follows:

Task # 3 involving pulling or pushing the small lathe appears to generate moderate shoulder forces which, along with the repetitive jerking required for inertial loading to move it, would represent an unacceptable risk when sustained over full shifts for prolonged number of days.

Tasks # 4 and 5 involving overhead reaching on the Bridgeport Mill generate extremely high torque forces about the shoulder. Only 7% and 0% of males are predicted to be capable of performing this task according to the model.

Admittedly, workers are capable of doing this type of work, and the limitations of biomechanical modelling must be recognized in this case. However, given the data, it appears this specific activity, represents an unusually high risk for any individual with less than full strength, endurance or shoulder girdle integrity.

Task # 6 involving the drill press suggests that 65% of males would be capable of performing this task. This represents a mild to moderate type of risk for possible shoulder injury or aggravation of a preexisting shoulder condition.

activity and, accordingly, she awarded medical and temporary total disability benefits.

Hercules appealed to the Industrial Commission. In the course of the Commission's review, Commissioner Carlson visited the Hercules plant to investigate the job site and assess the nature of Chase's work-related activities. Two days before going to Hercules, Commissioner Carlson notified Chase and his counsel of his intention to visit the job site. On April 2, 1993, the Commission granted Hercules's motion for review and denied Chase's claim, on the ground that he failed to prove that his shoulder problems were caused or aggravated by his work activities.

## ISSUES

Chase asks us to overturn the Commission's reversal of the ALJ's decision. He claims that (1) the Commission erred in interpreting and applying the test for legal causation set forth in *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986), (2) the Commission's determination of no medical causation was not supported by substantial evidence, and (3) Commissioner Carlson's personal inspection of the job site constituted a denial of due process. In view of our disposition of petitioner's first two contentions, we need not reach the constitutional due process issue and related motion to supplement the record.[4]

## THE *ALLEN* TEST

■ In *Allen,* the Utah Supreme Court established the test for determining whether a preexisting condition that is exacerbated by employment activities constitutes a compensable industrial injury. 729 P.2d at 25–27. As part of the test, a claimant must prove both legal and medical causation, and failure to prove either precludes recovery. *Id.* To meet the legal causation requirement, "a claimant with a preexisting condition must show that the employment contributed something substantial to increase the risk he faced in everyday life because of his condition." *Id.* at 25. The element of risk is usually supplied by a showing of unusual exertion. *Id.* The court applies an objective standard to compare usual and unusual exertion, i.e., "the focus is on what typical nonemployment activities are generally expected of people in today's society, not what this particular claimant is accustomed to doing." *Id.* To meet the medical causation requirement, a claimant must "show by evidence, opinion, or otherwise that the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability." *Id.* at 27. We now undertake to apply the *Allen* test to the case at hand.

## LEGAL CAUSATION

■ Chase claims the Commission erred in applying the legal causation prong of the *Allen* test. Hercules all but concedes that the Commission's legal causation analysis was flawed.[5] It points out, however, that the Commission's primary focus was on medical causation, which was the articulated basis for its decision to reverse the ALJ's decision. Hercules contends that because Chase failed to prove medical causation, any error in determining legal causation was harmless in that it could not have prejudiced Chase's case. We agree that Chase must prove both legal and medical causation in order to prevail, *see Allen,* 729 P.2d at 25–27, but, as hereafter explained, we disagree that Chase failed to prove medical causation.

---

4. "It is a fundamental rule that this Court should avoid addressing constitutional issues unless required to do so." *State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985). *See Lounsbury v. Capel,* 836 P.2d 188, 196 (Utah App.), *cert. denied,* 843 P.2d 1042 (Utah 1992).

5. The Commission noted that Chase's "nonemployment activities [were] unusual when compared to general nonemployment life." Under *Allen,* the Commission should not have compared Chase's *non-employment* activities to some standard of normalcy; rather, it should have compared Chase's exertions *at Hercules* to the kind of exertions experienced in everyday life by the average person outside the employment arena. *See* 729 P.2d at 25–27. It is clear that the exertions associated with Chase's duties as a machinist were unusually arduous when compared to the everyday activities of the average person. *See* note 3. Therefore, under *Allen,* Chase's work-related activities constituted the legal cause of his temporary disability.

MEDICAL CAUSATION

██ While it is the ALJ who initially hears the evidence, the Commission is the ultimate fact finder. *Virgin v. Board of Review*, 803 P.2d 1284, 1287 (Utah App.1990). Medical causation is an issue of fact, *id.* ("Medical causation, including whether an industrial accident aggravated a pre-existing condition, is a factual matter."), and we review the Commission's findings under the substantial evidence standard. *See Willardson v. Industrial Comm'n*, 856 P.2d 371, 374 (Utah App.1993); *King v. Industrial Comm'n*, 850 P.2d 1281, 1285 (Utah App. 1993); Utah Code Ann. § 63–46b–16(4)(g) (1993).[6] "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Willardson*, 856 P.2d at 374 (quoting *Department of Air Force v. Swider*, 824 P.2d 448, 451 (Utah App.1991)). We will sustain the Commission's factual determination concerning medical causation only if its finding is adequately supported by the record. *See Willardson*, 856 P.2d at 374. *See also Niederhauser v. State Tax Comm'n*, 858 P.2d 1034, 1036 (Utah App.1993) (appellate court will "affirm an agency's findings of fact 'only if they are supported by substantial evidence when viewed in light of the whole record before the court'") (quoting *Grace Drilling Co. v. Board of Review*, 776 P.2d 63, 67 (Utah App.1989)); Utah Code Ann. § 63–46b–16(4)(g) (1993).

██ "Medical causation demands that petitioner 'prove [his] disability is medically the result of an exertion or injury that occurred during a work-related activity.'" *Id.* at 374–75 (quoting *Allen*, 729 P.2d at 27). "'The key question in determining causation is whether given this body and this exertion, the exertion in fact contributed to the injury.'" *Stouffer Foods Corp. v. Industrial Comm'n*, 801 P.2d 179, 182 (Utah App.1990) (quoting *Allen*, 729 P.2d at 24). In order to answer this question, we must focus on what exertions by Chase are involved. *See id.; Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 334 (Utah App.1990), *cert. denied*, 815 P.2d 241 (Utah 1991). The "exertions" involved here were working eight to thirty-three hour shifts, five to seven days per week, operating machining equipment that repeatedly required tightening and loosening vices, clamping down parts, and manipulating a two-hundred pound "tail stock." Chase's industrial injury, therefore, did not result from a single incident of operating machinists' equipment. Instead, it was the result of repetitive physical stress associated with performing machinists' tasks for extended periods.[7]

In the case at hand, it is undisputed that Chase's recreational activities originally caused the shoulder condition underlying his temporary disability. The question is whether his workplace activities aggravated this condition and are therefore causally connected to the subsequent onset of the more severe symptoms which necessitated surgery and resulted in temporary disability. *See Allen*, 729 P.2d at 25–27. The Commission concluded "that there is no credible evidence that his workplace activities contributed in any degree to the shoulder injury." This factual determination, however, is not supported by substantial evidence. On the contrary, the record compels the opposite conclusion.

6. Utah Code Ann. § 63–46b–16(4) (1993) states, in pertinent part, as follows:
 The appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by ... a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court.

7. "This fits within the broad definition of 'compensable accidents' in *Allen*. '[An accident] is not necessarily restricted to some single incident which happened suddenly at one particular time and does not preclude the possibility that due to exertion, stress, or other repetitive cause, a climax might be reached in such a manner as to properly fall within the definition of an accident....' Thus the Utah Supreme Court allowed for a compensable injury to include an injury which was the result of a repetitive exertion." *Stouffer Foods Corp. v. Industrial Comm'n*, 801 P.2d 179, 183 n. 4 (Utah App.1990) (quoting *Allen*, 729 P.2d at 18) (citations omitted). *See Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 334–35 (Utah App.1990), *cert. denied*, 815 P.2d 241 (Utah 1991).

On several occasions, Dr. Paulos, Chase's treating physician, opined that Chase's shoulder condition was aggravated by his employment activities. The ergonomic tests conducted by Dr. Johns indicated that Chase's employment activities placed tremendous stress on his shoulder. Similarly, Alan Heal, Chase's rehabilitation coordinator, recognized the nature of Chase's work necessitated reassigning him in order to avoid further aggravation of his shoulder injury. While Dr. Johns opined that Chase's machinist work did not cause his shoulder condition, he expressed no opinion on whether such work aggravated the condition. Nonetheless, the ergonomic data developed by Dr. Johns demonstrated that such aggravation would be inevitable.

There is simply nothing in the record to support the Commission's finding that Chase's employment activities did not aggravate his preexisting condition and contribute to his ultimate disability. Accordingly, the Commission's finding of no medical causation is not supported by substantial evidence on the record as a whole, and its resulting decision must be set aside.

## CONCLUSION

Chase's employment activities met the legal standard of unusual or extraordinary exertion necessary to constitute a compensable industrial injury. The Commission's determination that Chase failed to establish his employment activities were a medical cause of his temporary disability is not supported by substantial evidence. The Commission's decision is therefore reversed, and the case is remanded with instructions to affirm the findings and order of the ALJ, with such modifications, not inconsistent with our decision, as may be in order.[8]

BENCH and JACKSON, JJ., concur.

---

8. For example, the Commission noted that if Chase had been entitled to an award of benefits, the ALJ's calculation of the fee due his attorney was incorrect. In view of our decision that Chase is entitled to benefits, the Commission should adjust the fee award as appropriate.