2020 UT App 53

# THE UTAH COURT OF APPEALS

FASTENAL AND PHOENIX INSURANCE,
Petitioners,
*v.*
LABOR COMMISSION AND RONALD STONE,
Respondents.

Opinion
No. 20180196-CA
Filed April 2, 2020

Original Proceeding in this Court

Mark R. Sumsion and Lori L. Hansen, Attorneys
for Petitioners

Phillip B. Shell, Attorney for Respondent
Ronald Stone

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1     Having concluded that putting the pedal to the metal repeatedly for up to eleven hours a day while driving semi-trucks for Fastenal caused Ronald Stone's foot ulcer, the Labor Commission determined that Stone was entitled to workers' compensation benefits. Fastenal asserts that the Commission violated its right to due process in several ways, most significantly by omitting certain pieces of evidence from the medical panel's (Panel) consideration in its determination of medical causation. Fastenal also contends that the Commission erred in determining legal causation. We decline to disturb the Commission's order.

## BACKGROUND[1]

¶2    From April 2013 to July 2014, Stone worked for Fastenal driving semi-trucks that operated on a manual transmission with fifteen gears. Stone's work schedule included driving for eleven hours per day to make deliveries in various cities throughout the country. During one of his driving trips, Stone discovered a pressure ulcer on the heel of his left foot. Stone's doctor opined that Stone's significant hours driving caused the ulcer and treated it with cleanings and bandages for several months.

¶3    Stone brought a claim for workers' compensation benefits for his medical expenses and temporary total disability. During discovery, another doctor designated by Fastenal (Doctor) diagnosed Stone with peripheral neuropathy, concluded that the condition had existed for seven-and-a-half years, and opined that Stone's driving did not cause the pressure ulcer. A biomechanical expert (Expert) retained by Fastenal issued a report in which Expert determined that the semi-truck clutch required sixty-seven pounds of pressure to be fully engaged. The report also explained that this required force was more than that required to operate the clutch of consumer vehicles such as a Mini Cooper, a Ford F-150, and a Jeep Wrangler. After assessing Expert's report, Doctor still opined in a second letter that Stone's injury was not work-related. In coming to this opinion, Doctor explained that the pressure of engaging the semi-truck clutch "would be much less than what would be expected with *walking*" and concluded that "[t]his would be considered a normal activity of daily living and not an industrial exposure." (Emphasis added.) On April 6, 2015, Stone

---

1. "We state the facts and all legitimate inferences drawn therefrom in the light most favorable to the agency's findings." *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 2 n.1, 211 P.3d 382 (cleaned up).

underwent surgery on his left foot to reconstruct a rigid cavus deformity.[2]

¶4    Thereafter, a hearing was held at which Fastenal presented testimony from Expert. In relevant part, Expert's testimony outlined the same information regarding pounds of force used in engaging a semi-truck clutch as compared to the force required to engage the clutch of the assortment of consumer vehicles. His testimony at the hearing, however, also included a comparison of force among driving the semi-truck, standing, and walking. Expert explained that the latter two activities imposed more force, suggesting that Stone could have developed the ulcer from one of these ordinary daily activities. The standing-walking-driving-comparison testimony was not in Expert's written report.

¶5    For his part, Stone testified about driving the semi-trucks. In pertinent part, he testified about how he used his left foot to engage the clutch, saying, "I would use the instep 60% of the time and use the ball of my foot 40% of the time." Stone also testified about his April 6, 2015 surgery. The medical records regarding the surgery were not provided at the hearing.

¶6    After the hearing, the administrative law judge (Initial ALJ) who presided over the hearing retired, and a new administrative law judge (Replacement ALJ) was assigned to the case. The Replacement ALJ issued an interim order, concluding that legal causation had been proven and referring the matter to the Panel to determine medical causation. The order did not

---

2. A cavus deformity "is an abnormal elevation of the medial longitudinal arch of the foot. . . . The deformity is typically flexible at first and then becomes rigid." *Cavus Foot*, Pediatric Orthopaedic Soc'y of N. Am., https://posna.org/Physician-Education/Study-Guide/Cavus-Foot [https://perma.cc/LY92-8GJ6].

reference Expert's testimony about the walking-standing-driving comparison of force.

¶7     Fastenal then filed an interlocutory motion for review with the Commission. In its motion, Fastenal argued that the Replacement ALJ's conclusion regarding legal causation was incorrect, and Fastenal sought the inclusion of the omitted evidence: Expert's full testimony, specifically the amount of force exerted on an individual's feet while standing and walking, and the medical records related to the surgery. Stone agreed that the evidence should be included. Reasoning that Fastenal could renew its objection "if necessary depending on the specifics of the [P]anel's report," the Commission dismissed Fastenal's motion in its entirety. The evidence was never provided to the Panel for its consideration of medical causation.

¶8     The Panel assessed the evidence provided to it and issued its report. In it, the Panel noted that Stone suffered from a preexisting condition of peripheral neuropathy, which meant "he had a loss of protective sensation in his foot" and "was 7 times more likely to suffer a foot ulcer than the general population." The Panel also noted that Stone "underwent surgery in April 2015 to help with foot realignment." Ultimately, the Panel determined that operating the semi-truck clutch medically caused Stone's pressure ulcer: "This repetitive pressure resulted in micro trauma and eventually ulceration secondary to [Stone's] known peripheral neuropathy." No party objected to the Panel's report. In the absence of any objection, the Replacement ALJ adopted the Panel's report. The Replacement ALJ then issued updated findings, conclusions, and an order.

¶9     While Fastenal did not file an objection to the Panel's report, Fastenal did file a motion asking the Commission to direct the Panel to review Expert's testimony and the medical documentation of Stone's surgery. In support, Fastenal included Doctor's report concluding that the walking-standing-driving comparison of force showed that pushing the semi-truck clutch would not have caused Stone's ulcer. Doctor also opined that the

surgery was not work-related, as it was to address the cavus deformity. The Commission denied Fastenal's motion and upheld the Replacement ALJ's order, awarding Stone the benefits. In its order, the Commission pointed out that the Panel was aware of Stone's April 2015 surgery, and the Commission assessed Expert's testimony regarding force.

¶10  Fastenal now seeks judicial review.


ISSUES AND STANDARDS OF REVIEW

¶11  There are two issues for us to decide. First, we consider whether the Commission properly determined legal causation, which we review for correctness. *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 17, 345 P.3d 1242 ("[W]e review the law applied to these facts for correctness.").

¶12  Then, we review whether the Commission violated Fastenal's right to due process. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990 (cleaned up).


ANALYSIS

¶13  In order to obtain workers' compensation benefits, it is incumbent upon a claimant to prove that his or her injury occurred by accident and arose out of and in the course of his or her employment. Utah Code Ann. § 34A-2-401(1) (LexisNexis 2019).[3] Under *Allen v. Industrial Commission*, 729 P.2d 15 (Utah

_____

3. The parties do not dispute whether Stone's injury meets the "by accident" element of a workers' compensation claim. *See* Utah Code Ann. § 34A-2-401(1) (LexisNexis 2019). Therefore, we need not decide the issue. And because the statutory provisions

(continued…)

1986), and its progeny, this requires a claimant to "establish that the conditions or activities of his job were both the medical cause and the legal cause of his injury." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 45, 308 P.3d 461; *see also Allen*, 729 P.2d at 25–28. Here, we first address the Commission's conclusion on legal causation. Then, we turn our focus to Fastenal's due process claims related to medical causation.

## I. Legal Causation

¶14    "If an employee does not have a preexisting condition that causally contributed to his injury, then the medical and legal causation requirements are one and the same, and the employee need only prove medical causation." *Murray*, 2013 UT 38, ¶ 45. However, when an employee brings a causally contributing preexisting condition to the equation, as is indisputably true here,[4] the employee must meet the more stringent *Allen* test: "the employment contributed something substantial to increase the risk he already faced in everyday life because of his condition." *Allen*, 729 P.2d at 25. This heightened test "is not meant to prevent workers with preexisting conditions from recovering benefits." *Nyrehn v. Industrial Comm'n of Utah*, 800 P.2d 330, 335 (Utah Ct. App. 1990); *see also Peterson v. Labor Comm'n*, 2016 UT App 12, ¶ 12, 367 P.3d 569 ("Just because a person suffers a preexisting condition, he or she is not disqualified from obtaining compensation." (cleaned up)). Rather, it "serves to offset the preexisting condition of the employee as a likely cause

---

(…continued)
we cite have not changed in any material way, we cite the current version of the code throughout this opinion for convenience.

4. The Replacement ALJ specifically found that Stone suffered from the preexisting condition of peripheral neuropathy. The parties do not dispute that Stone had this causally contributing preexisting condition.

of the injury, thereby eliminating claims for impairments resulting from a personal risk rather than exertions at work." *Allen*, 729 P.2d at 25. Therefore, "we must determine whether this activity is objectively unusual or extraordinary" under the totality of the circumstances. *Murray*, 2013 UT 38, ¶ 48 ("We compare the activity that precipitated the employee's injury with the usual wear and tear and exertions of nonemployment life." (cleaned up)).

¶15　Repetition of a workplace activity can constitute an objectively unusual or extraordinary exertion. *See id.* ¶ 51 ("Utah courts have deemed employment activities to be 'unusual' or 'extraordinary' when they require an employee to endure jumping, lifting great weight, or *repetition*." (emphasis added)); *Nyrehn*, 800 P.2d at 336 ("When an accident is the climax of repeated exertions . . . [it] is the aggregate exertion of the repetitive exertions that establish the accident."); *see also Chase v. Industrial Comm'n of Utah*, 872 P.2d 475, 479–80 (Utah Ct. App. 1994) (holding that legal causation was met as a "result of repetitive physical stress associated with performing machinists' tasks for extended periods").

¶16　For example, in *Miera v. Industrial Commission of Utah*, 728 P.2d 1023 (Utah 1986), our supreme court held that an employee's repeated "jumps into an eight-foot hole from a four-foot platform at thirty-minute intervals constitute[d] a considerably greater exertion than that encountered in non-employment life and [were] therefore legally sufficient" to establish legal causation. *Id.* at 1024–25. Similarly, in *Stouffer Foods Corp. v. Industrial Commission of Utah*, 801 P.2d 179 (Utah Ct. App. 1990), this court concluded that "applying repeated or constant pressure to the grips of high-pressure hoses" was objectively unusual or extraordinary. *Id.* at 183. In so holding, this court narrowed its focus on the repetitive nature of the activity, explaining that "while occasionally using a . . . hose may be fairly regarded as typical of everyday life, applying repeated or constant pressure to the grips of high-pressure hoses . . . for hours at a time is not a typical non-employment activity." *Id.*

(cleaned up). Finally, in *Nyrehn*, this court focused on the repetitious nature of the work-related exertion as well. 800 P.2d at 336. The employee lifted "a tub of merchandise weighing between 15 and 40 pounds . . . 30 to 36 times a day for two and a half months." *Id.* Even though it was only a "moderately strenuous" activity, the lifting amounted to an objectively unusual exertion because it was performed repeatedly. *Id.*

¶17 Stone's employment activity meets this same standard. Even though people are generally expected to endure some pressure on their feet in everyday life, the period and extent of the repeated pressure on Stone's left foot, in the aggregate, amounted to an unusual exertion. Stone drove a semi-truck over an extended period of time—from April 2013 to July 2014. Driving the semi-truck required even more force to operate the clutch than that of an assortment of consumer vehicles. And Stone had to drive for approximately eleven hours per day on the days he worked. Moreover, there was testimony that Stone used the instep of his foot to shift about 60% of the time in a somewhat awkward angle.[5] *Cf. Peterson*, 2016 UT App 12, ¶¶ 15–17 (holding that "the unusual and awkward manner in which the employee lifted an otherwise-manageable amount of weight resulted in an injury" and constituted an unusual or extraordinary exertion). Analogous to the repetitious activities in *Stouffer* and *Nyrehn*, operating the semi-truck clutch under these repetitive circumstances was sufficient to meet the higher standard of legal causation described in *Allen*. Accordingly, we decline to disturb the Commission's determination that legal causation was met.[6]

---

5. Another Fastenal employee testified at the hearing that using the instep of the foot, rather than the ball of the foot, would be awkward.

6. Fastenal argues that the Commission erred in not assessing the comparative forces required to stand and walk versus that

(continued…)

## II. Medical Causation—Due Process

¶18 The Commission ultimately concluded that driving the semi-truck was the medical cause of Stone's injury. Fastenal contends that the manner in which the Commission came to its conclusion on medical causation violated its right to due process. Fastenal props up this contention with a claim that it did not receive a fair hearing based on the replacement of the Initial ALJ. Fastenal also argues that the Commission prejudicially omitted evidence from the Panel important to its determination of medical causation. Finally, Fastenal argues that the Commission

---

(…continued)
required to operate the semi-truck's clutch. We disagree. First, the Commission noted the amount of force required to engage a semi-truck clutch exceeded that of vehicles' clutches typically used in everyday non-employment life. The Commission also noted the repetition and awkwardness of the activity, which would be different from everyday life. And importantly here, it was not the amount of force but the repetitiveness and awkwardness of the activity that were the key factors. Although Fastenal is correct that the proper analysis is a totality of the circumstances test in assessing the workplace injury, *see Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶¶ 47–48, 308 P.3d 461, the Commission is not required to compare every activity offered by the parties in its analysis of whether the exertion is unusual or extraordinary; rather, it may focus on apt comparisons, as it did here, *see id.* ¶ 53 (focusing on apt comparisons of everyday life to the individual's boating activity, such as carrying luggage heavier than the individual's belt and life jacket and encountering bumpy rides in planes or buses similar to the small wave that rocked the individual's boat). Requiring every comparison would allow any party to complain merely because the Commission did not adopt that party's desired comparisons, and the Commission could be stuck in a never-ending chasm of required analogies.

erroneously asserted that the "Panel consisted of experts in force."

¶19   "At a minimum, due process requires timely and adequate notice and an opportunity to be heard in a meaningful way." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 50, 299 P.3d 990 (cleaned up). "Due process is flexible and, being based on the concept of fairness, should afford the procedural protections that the given situation demands." *Dairy Product Services, Inc. v. City of Wellsville*, 2000 UT 81, ¶ 49, 13 P.3d 581 (cleaned up).

¶20   In the context of Labor Commission adjudications, "the Commission is afforded broad discretion in determining how best to conduct its inquiry into each case." *JP's Landscaping v. Labor Comm'n*, 2017 UT App 59, ¶ 48, 397 P.3d 728 (cleaned up). "In this regard, the Commission 'may make its investigation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties and to carry out justly the spirit of the Workers' Compensation Act.'" *Id.* (quoting Utah Code Ann. § 34A-2-802(1)) (cleaned up). And "while principles of due process extend to administrative hearings, it is well established that such hearings need not have all the formality of judicial procedure." *Nelson v. City of Orem*, 2013 UT 53, ¶ 36, 309 P.3d 237 (cleaned up). Indeed, an appellate court "shall grant relief only if, on the basis of the agency's record, it determines that the agency action constituted an abuse of the discretion delegated to the agency by statute and that the person seeking judicial review has been substantially prejudiced as a result." *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 19, 428 P.3d 26 (cleaned up); *see also* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019). With this legal framework in mind, we address Fastenal's arguments in turn.

A.   ALJ Replacement

¶21   Fastenal claims that the replacement of the Initial ALJ was unfair because the Replacement ALJ did not review the hearing transcript. Fastenal's only support for this claim is that the

Replacement ALJ did not mention Expert or his testimony in the interim order to the Panel. This argument is unpersuasive.

¶22  To begin with, Fastenal's argument is contrary to precedent. *See Utah Auto Auction v. Labor Comm'n*, 2008 UT App 293, ¶¶ 16–17, 191 P.3d 1252 (holding that the assignment of a workers' compensation claim to a new ALJ upon the retirement of another ALJ who presided over the initial hearing did not deny a party its right to due process). In *Utah Auto Auction*, this court concluded that a materially indistinguishable argument was "without merit because the Commission is the final body to review the ALJ's decision and does so without the benefit of having been present at the original hearing." *Id.* ¶ 17. Fastenal "is appealing from the Commission's decision, not the [Replacement] ALJ's decision; the Commission had the benefit of the full record at the time it reviewed this case; and without any indication to conclude otherwise, we presume that the Commission did in fact review the record." *See id.* Except here we don't even need to resort to this presumption. In its final order, the Commission explicitly addressed the Expert's hearing testimony that Fastenal complains was not mentioned by the Replacement ALJ. Consequently, Fastenal's argument is unavailing.

¶23  To add to this, the Administrative Procedure Act cuts against Fastenal's argument. It specifically allows for the substitution of administrative law judges and other presiding officers in adjudicative proceedings: "If fairness to the parties is not compromised, an agency may substitute one presiding officer for another during any proceeding." Utah Code Ann. § 63G-4-103(1)(h)(ii). And the record does not support Fastenal's claim that fairness was compromised by the substitution.

¶24  And last, but not least, the facts of this case undermine Fastenal's argument as well. In his interim order to the Panel, the Replacement ALJ included a footnote explicitly stating that he had reviewed the hearing record. Contrary to Fastenal's assertion, the Replacement ALJ in fact did refer to Expert in the

order—specifically Expert's testimony about the sixty-seven pounds of pressure required to engage the semi-truck clutch, which exceeded that of comparison consumer vehicles. The Commission also noted that the Replacement ALJ's order included "testimony of Fastenal's expert witness." Fastenal points out that the same evidence referenced by the Replacement ALJ is in Expert's report. But simply pointing this out does not meet Fastenal's burden of showing that the replacement caused Fastenal substantial prejudice. *See id.* § 63G-4-403(4). In short, Fastenal has not proven a due process violation based on the fact that the Replacement ALJ merely did not mention the particular piece of testimony that Fastenal wishes.

B.    Omitted Evidence

¶25    Next, Fastenal maintains that its constitutional due process rights were violated by the Replacement ALJ not expressly directing the Panel to consider Expert's hearing testimony on forces experienced by people when walking and standing. As outlined, *see supra* ¶¶ 6–7, before the Panel conducted its review of the case, Fastenal filed an interlocutory motion for review, which attacked the Replacement ALJ's conclusion regarding legal causation and sought inclusion of two things: Expert's full testimony regarding force exerted on an individual's feet while standing and walking and medical records of Stone's surgery. The motion for review was denied, partially on the basis that depending on how the case progressed, the issues raised might very well become moot. The Panel then undertook its review and issued a report. As the Replacement ALJ noted in his subsequent order, Fastenal did not object to the Panel's report: "None of the parties filed written objections to the . . . [P]anel report."

¶26    Fastenal does not explain why no objection was filed, which seems odd in the context of the claims made before us. Here, the applicable statutory and rule scheme provides a specific process for Fastenal to address the issues it raises. But Fastenal has chosen not to employ that process at all.

Nevertheless, Fastenal claims a constitutional lack of due process. We reject this attempt.

¶27    Section 34A-2-601(2)(d)(ii) of the Utah Code expressly provides that parties may file objections to a medical panel report *with the ALJ*. And the next subsection states, "If no written objection is filed within the period described in Subsection (2)(d)(ii), the report is considered admitted in evidence." Utah Code Ann. § 34A-2-601(2)(d)(iii). Furthermore, rule R602-2-2(B)(4) of the Utah Administrative Code expressly provides that the objection can request that a medical panel clarify a medical panel report or ask an ALJ to have a medical panel consider new conflicting medical evidence. *See also, e.g., Right Way Trucking, LLC v. Labor Comm'n*, 2015 UT App 210, ¶¶ 10–20, 357 P.3d 1024 (demonstrating that objections as to whether a medical panel should review certain documents are submitted to the ALJ). Here, medical records—specifically those related to Stone's 2015 surgery—could have been addressed by way of an objection submitted to the Replacement ALJ, but Fastenal did not avail itself of that process. Likewise, as to consideration of Expert's hearing testimony, Fastenal could have attempted to seek a clarification of the Panel's report, but again, it did not. Instead of asking the Replacement ALJ, Fastenal incorrectly attempted to ask the Commission to order the Panel to review these pieces of evidence. Thus, Fastenal's procedural complaints regarding the omitted evidence are unfounded because they should have been addressed in an objection submitted to the Replacement ALJ.

¶28    Additionally, the Commission is the ultimate factfinder endowed with the prerogative and duty to consider all the evidence. *See Utah Auto Auction*, 2008 UT App 293, ¶ 17; *see also, e.g., Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶ 19, 372 P.3d 44 ("It is the province of the Commission—not the medical panel—to view all the evidence submitted as a whole and then make an appropriate determination . . . that substantial evidence supported one determination more than another." (cleaned up)); *Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 14, 339 P.3d 624 ("It is the prerogative and the duty of the Commission

to consider not only the report of the medical panel, but also all of the other evidence and to draw whatever inferences and deductions fairly and reasonably could be derived therefrom." (cleaned up)). In *Bade-Brown*, we addressed a petitioner's argument that "the ALJ abused its discretion by admitting the medical panel report into evidence despite glaring deficiencies in the report." 2016 UT App 65, ¶ 6. We explained that "the medical panel's role is to assist the Commission by evaluating medical evidence and advising the Commission with respect to its ultimate fact-finding responsibility." *Id.* ¶ 12 (cleaned up). We further clarified that not all objections "are of sufficient significance to justify the time and expense" of the requested remedy. *Id.* ¶ 14. In rejecting the petitioner's argument, we reasoned that "the Commission in essence concluded that the medical panel's flawed [maximum medical improvement] finding was harmless because the preponderance of the evidence still indicated" that the petitioner was not entitled to benefits. *Id.* ¶ 16.

¶29    And here, the Commission assessed and weighed all the evidence in coming to its conclusion that Stone's work activity medically caused his injury. The Commission explicitly addressed Expert's testimony regarding force.[7] It also accurately explained that the Panel was aware of Stone's April 2015 surgery. Indeed, the Panel specifically noted that Stone "underwent surgery in April 2015 to help with foot realignment."

---

7. The Panel also had Doctor's second letter in which he noted that the pressure of engaging the semi-truck clutch "would be much less than what would be expected with walking." The Panel was also aware of Expert's report including the comparisons of force required to operate the different clutches. While this report did not include the exact details of the pounds of force involved in walking and standing, it did bring the issue of force to the Panel's attention.

¶30 Fastenal does not contend that there was any evidence that it could not bring before the Replacement ALJ or the Commission. Nor does Fastenal claim that there were any arguments it was precluded from making. And when these issues were presented to the Commission, the Commission determined that even if the Panel would have had the information Fastenal claims it should have had, it would not have changed the outcome. Accordingly, under these circumstances, we perceive no due process deprivation; these proceedings provided Fastenal a sufficient opportunity to be heard, given the Commission's "broad discretion in determining how best to conduct its inquiry into each case." *See JP's Landscaping*, 2017 UT App 59, ¶ 48 (cleaned up).[8]

C.    Panel Expertise

¶31 Fastenal also argues that the Commission erroneously asserted that the "Panel consisted of experts in force." But more precisely, the Commission said that the members of the Panel, "as trained experts, were aware of the difference in exertion between standing and walking and the repetitive use of one's foot to engage a [semi-]truck clutch." This distinction is meaningful. And we have no reason to suspect that the Commission's statement is inaccurate, where one Panel member is an expert in occupational medicine,[9] and the

---

8. Moreover, Fastenal does not point to specific details in the surgical report that would have affected the Panel's analysis, especially where the Panel was already aware of Stone's April 2015 surgery. Thus, as to that piece of evidence, Fastenal does not meet its burden of showing substantial prejudice. *See* Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019).

9. Occupational medicine "is a board-certified specialty . . . that focuses on the diagnosis and treatment of work-related injuries and illnesses. . . . [Specialists] are the leading experts in the complex web of factors that affect health in the workplace,

(continued…)

other is a sports-medicine specialist.[10] Indeed, the Panel report recites, and Fastenal has not disputed, that one doctor "is a board certified occupational medicine physician with experience in injuries and illnesses sustained in the industrial setting" and that the other "is board certified in internal medicine with a specialty in sports medicine." We simply reject the premise that medical doctors, particularly those who specialize in occupational medicine or sports medicine, are incompetent to opine as to the operation of the human body and to consider activities of the workplace in comparison to walking or standing.

¶32   In any event, the statute does not require the members of the panel to be experts in force; it requires them "to specializ[e] in the treatment of the disease or condition involved in the claim." Utah Code Ann. § 34A-2-601(1)(c); *accord Foye*, 2018 UT App 124, ¶ 21. Thus, because the members of the Panel easily fit this bill, we see no due process violation, as complained of by Fastenal, especially given the Commission's explicit review of the evidence of force in its final order. *See Bade-Brown*, 2016 UT App 65, ¶ 19.

---

(…continued)
helping all types of organizations ensure the health of their employees, productivity of the workplace, and advancement of the overall economy." *What is Occupational Medicine?*, Am. Coll. of Occupational & Envtl. Med., http://acoem.org/Careers/What-Is-OEM [https://perma.cc/9GGL-UD6M].

10. Sports medicine involves "significant specialized training in both the treatment and prevention of illness and injury. . . . Sports medicine physicians specialize in the non-operative treatment of musculoskeletal conditions." *What is a Sports Medicine Physician – Sports Medicine Today*, Am. Med. Soc'y for Sports Med., https://www.sportsmedtoday.com/what-is-a-sports-medicine-physician.htm [https://perma.cc/J5VA-JYQY].

CONCLUSION

¶33 We hold that the Commission's determination of legal causation was correct, and we have discerned no violation of Fastenal's right to due process on this record. Accordingly, we decline to disturb the Commission's order.

———————