2020 UT App 86

## THE UTAH COURT OF APPEALS

JBS USA AND AMERICAN ZURICH INSURANCE,
Petitioners,
*v.*
LABOR COMMISSION AND LEONTINE FOSTER,
Respondents.

Opinion
No. 20190694-CA
Filed June 4, 2020

Original Proceeding in this Court

Brad J. Miller, Attorney for Petitioners

Jared L. Mortenson, Attorney for Respondent
Leontine Foster

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1 JBS USA and its insurer, American Zurich Insurance, (collectively, JBS) seek judicial review of the order of the Labor Commission Appeals Board (the Commission) determining that Leontine Foster is entitled to workers' compensation benefits. JBS both challenges the Commission's factual findings and contends that the Commission erred in concluding that the aggravation of Foster's preexisting conditions was legally caused by the act of her jumping out of the cabin of her semi-truck under exigent circumstances. We decline to disturb the Commission's order.

BACKGROUND[1]

¶2 Foster, a professional truck driver with 22 years of experience, began working for JBS in early August 2018. She came to her new employment with preexisting conditions in her right knee and lower back. In 1996, she underwent knee replacement surgery on her right knee. In 2015, she "was diagnosed with a mild disc bulge with annular fissuring and moderate facet arthrosis at the L5-S1 level of her lumbar spine." And in 2017, Foster slipped on an oily surface, injuring both her back and right knee. Foster did not have any preexisting injuries to her left knee.

¶3 On August 19, 2018, Foster was driving a semi-truck on a freeway in San Bernardino County, California, when she noticed an unusual odor, "like something [was] burning." She pulled over and was about to call JBS to report a mechanical issue when she heard "a loud explosion" coming from what appeared to be the front passenger's side of the vehicle. Foster immediately feared that the truck would "blow[] up," and she exited "as fast as possible." She did so by opening the driver's side door, standing with both feet on the top stair located approximately 40 inches above the ground, jumping away from the truck, and landing on the ground with both feet. This deviated from her usual method of exiting the truck, which involved a three-point stance "where at all times three parts of your body, either both feet and one hand or two hands and one foot is touching the truck as you exit" via steps, while facing the vehicle.

¶4 Upon landing on the ground, Foster "just kept moving" and ran to the front passenger's side of the truck where she believed the noise had originated. There, she found that one of

---

1. "In reviewing an order from the Commission, we view the facts in the light most favorable to the Commission's findings and recite them accordingly." *O'Connor v. Labor Comm'n*, 2020 UT App 49, n.1.

the tires had blown out and was on fire. Because Foster knew that there were two 75-gallon fuel tanks under the hood on each side of the truck, she did not risk climbing back into the cabin to retrieve the fire extinguisher—or even her purse. Instead, Foster distanced herself from the burning vehicle and called 911, then JBS. While waiting for first responders to arrive, Foster heard additional explosions, and the fire spread throughout the truck. Firefighters allowed the fire to burn itself out. The fire destroyed the vehicle and its contents.

¶5 Two days later, on August 21, JBS concluded that the fire was the result of Foster's improper use of braking equipment and terminated her employment. Four days later, Foster provided JBS with a written statement describing the incident. In it, she stated that although she did not feel pain immediately after jumping and running away from the truck, she had since developed pain in her legs and back. Foster at first attempted to self-treat her injuries by heating and icing her knees and using a heating pad on her lower back, but she sought medical care on August 29. Foster's treating physician and JBS's medical consultant both concluded that the aggravation of Foster's preexisting knee and lower back injuries was medically caused by her act of jumping out of the truck, as was the new injury to her left knee.

¶6 Foster filed for workers' compensation benefits in late September. An administrative law judge (the ALJ) held a hearing in March 2019, and issued findings of fact, conclusions of law, and an order granting workers' compensation benefits to Foster. JBS appealed the ALJ's order to the Commission. The Commission affirmed the ALJ. It adopted the ALJ's findings of fact and likewise determined that Foster was entitled to workers' compensation benefits. Regarding legal causation, the Commission held that "Foster's work activity under calmer conditions may not have involved an unusual exertion. . . . [H]owever, when considering the dangerous and exigent circumstances in this case, . . . Foster's work activity involved an unusual exertion." JBS now seeks judicial review of the

Commission's order. *See* Utah Code Ann. § 34A-2-801(9)(a) (LexisNexis 2019).

ISSUES AND STANDARDS OF REVIEW

¶7    JBS raises two issues in its petition for judicial review. First, it asserts that the Commission's "factual findings are not supported by substantial evidence." "When the Labor Commission's factual determinations are properly before us on review, we review them under the substantial evidence standard of review, examining the whole record to determine whether a reasonable mind might accept as adequate the evidence supporting the decision." *Quast v. Labor Comm'n*, 2017 UT 40, ¶ 15, 424 P.3d 15 (quotation simplified).

¶8    Second, JBS contends that the Commission erroneously determined that Foster met the more stringent standard of legal causation required for an award of benefits to an employee whose preexisting conditions contributed to her work-related injuries. *See generally Allen v. Industrial Comm'n*, 729 P.2d 15 (Utah 1986) (establishing a heightened standard for proving legal causation in the context of an employee with a preexisting condition). This issue "presents a traditional mixed question of law and fact." *Murray v. Labor Comm'n*, 2013 UT 38, ¶ 24, 308 P.3d 461. And because "the ultimate question is the legal effect of the facts," i.e., whether a given set of facts is objectively "unusual[]," "rather than witness credibility or demeanor," our review of the "ultimate question" is non-deferential.[2] *Id.* ¶ 40.

_____

2. Because JBS has not met its burden of persuasion on its challenge to the finding that Foster jumped out of the truck under exigent circumstances, *see infra* ¶¶ 9–12, we disregard JBS's factual challenge in addressing the legal causation issue. Instead, we consider the legal causation issue only in the context of the Commission's factual findings. *See Quast v. Labor Comm'n*,

(continued…)

ANALYSIS

I. Challenge to Findings of Fact

¶9    JBS argues that the Commission's finding that Foster jumped out of the truck under exigent circumstances is not supported by substantial evidence because the ALJ and the Commission did not "place proper weight on two separate officially recorded documents that describe the incident." Specifically, JBS refers to a report from the San Bernardino County Fire Department dated August 21, 2018—two days after the incident—stating that Foster pulled over upon detecting a burning smell and heard an explosion only *after* she had already exited the truck, and a medical record dated August 29, 2018, which stated that Foster "pulled over when she smelled the scent of fuel" and "[i]mmediately upon exiting the truck, the truck 'burst into flames.'" Foster, however, testified that she was still inside the truck when she heard the first explosion, which version of events was also consistent with the written statement she provided to JBS on August 25, 2018—four days prior to her August 29 medical visit. Regarding this discrepancy, the Commission stated that although the fire department's report "differs slightly" from Foster's version of events, such a difference was insufficient to call her testimony into question. The ALJ also "consider[ed] [the] inconsistency to be extremely minor and far too insignificant to support a conclusion that [Foster] is not credible," especially where the ALJ did not "have any difficulty seeing how an employee of the San Bernardino [County] Fire Department might have missed or simplified certain details in memorializing [Foster's] account of the

---

(…continued)
2017 UT 40, ¶ 19, 424 P.3d 15 ("While an appellate court is not required to assume that the record supports the findings of the fact-finder in the absence of marshaling, it may do so at its discretion.").

industrial accident when making a report hours, or possibly days, after hearing that account."

¶10    Relatedly, JBS also contends that the Commission erred in accepting Foster's explanation that she attempted to self-treat rather than consult a doctor for several days following the incident because she lacked the resources to cover the costs of medical care after JBS terminated her employment. JBS asserts that her delay in seeking treatment and in filing a formal report of injury with JBS "bear[s] on [Foster's] credibility and it was in error for the ALJ not to place more weight on these discrepancies."

¶11    Because "it is the province of the Commission . . . to view all the evidence submitted as a whole and then make an appropriate determination," appellate courts will not review the Commission's credibility assessments or reweigh evidence "*unless* the petitioner is able to show that the Commission's findings and conclusions regarding causation are not supported by substantial evidence." *Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶ 19, 372 P.3d 44 (emphasis added) (quotation otherwise simplified). "Substantial evidence," in turn, "is more than a mere scintilla of evidence though something less than the weight of the evidence, and the substantial evidence test is met when a reasonable mind might accept as adequate the evidence supporting the decision." *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 16, 428 P.3d 26 (quotation simplified). To show that a disputed finding is not supported by substantial evidence, "the party challenging the factual findings must marshal all of the evidence and demonstrate that, despite the facts supporting the decision, the findings are not supported by substantial evidence." *Quast v. Utah Labor Comm'n*, 2017 UT 40, ¶ 19, 424 P.3d 15 (quotation simplified). And "[w]hile an appellate court is not required to assume that the record supports the findings of the fact-finder in the absence of marshaling, it may do so at its discretion." *Id.*

¶12 Here, JBS has highlighted only the evidence it believes undermines Foster's credibility and has not marshaled the evidence supporting the Commission's factual findings. Accordingly, JBS has not met its burden of persuasion in this proceeding for judicial review, and we do not further address this issue. *See Widdison v. Kirkham*, 2018 UT App 205, ¶ 9, 437 P.3d 555 ("Although failing to marshal the evidence is no longer considered a technical deficiency, an appellant failing to marshal all relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous will almost certainly fail to carry their burden of persuasion on appeal.") (quotation simplified). We now turn to the primary issue concerning legal causation under *Allen*.

## II. Legal Causation

¶13 The Workers' Compensation Act provides benefits to workers injured in accidents "arising out of and in the course of" employment. Utah Code Ann. § 34A-2-401(1) (LexisNexis 2019). To be compensated for an injury under the act, an employee must establish that (1) the injury was the result of an accident, and (2) there is "a causal connection between the injury and the employment." *Murray v. Labor Comm'n*, 2013 UT 38, ¶ 44, 308 P.3d 461 (quotation simplified). It is undisputed that Foster's injury was the result of a workplace accident.

¶14 To satisfy the second element, an employee must show that the accident was both the medical and legal cause of her injury. *See id.* ¶ 45. Generally, "medical and legal causation requirements are one and the same, and the employee need only prove medical causation," *id.*, which requires that the employee "show by evidence, opinion, or otherwise that the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability," *Allen v. Industrial Comm'n*, 729 P.2d 15, 27 (Utah 1986). However, when an employee's preexisting condition causally contributed to the workplace injury, the employee must meet a heightened standard of legal causation. *Murray*, 2013 UT 38, ¶ 45. This heightened standard "is

necessary to distinguish those injuries which coincidentally occur at work because a preexisting condition results in symptoms which appear during work hours without any enhancement from the workplace." *Id.* ¶ 46 (quotation simplified). It "is not meant to prevent workers with preexisting conditions from recovering benefits." *Fastenal v. Labor Comm'n*, 2020 UT App 53, ¶ 14 (quotation simplified). *See Allen*, 729 P.2d at 25 ("The aggravation or lighting up of a pre-existing disease by an industrial accident is compensable.") (quotation simplified).

¶15 Under this heightened standard, the employee "must show that 'the employment contributed something substantial to increase the risk [the employee] already faced in everyday life because of [the preexisting] condition.'" *Murray*, 2013 UT 38, ¶ 46 (quoting *Allen*, 729 P.2d at 25). This involves a two-step inquiry: "first, we must characterize the employment-related activity that precipitated the employees' injury, taking into account the totality of the circumstances; and second, we must determine whether this activity is objectively unusual or extraordinary." *Id.* ¶ 48. The overall focus of this inquiry is on "'what typical nonemployment activities are generally expected of people in today's society, not what this particular claimant is accustomed to doing.'" *Id.* (quoting *Allen*, 729 P.2d at 26).

¶16 The Commission found that the sound of an explosion caused Foster to become fearful and "to hurry and jump away from the truck" at a height of approximately 40 inches—i.e., three feet and four inches, which is about ten inches higher than the distance between the floor and the top of a typical dining room table[3]—and land on both feet. The Commission found that this action medically caused the aggravation of Foster's

---

3. "[T]he standard height for a dining room table is 30 inches off the ground." *Dining Room Table Heights*, Furniture.com, https://www.furniture.com/tips-and-trends/dining-room-table-heights [https://perma.cc/E7EK-YJDE].

preexisting injuries in her right knee and lower back.[4] At issue is whether Foster's action in jumping from the truck, taking the totality of these circumstances into consideration, is unusual, that is, one that is not "generally expected of people in today's society." *Id.* (quotation simplified). We conclude that it is.

¶17　Both parties direct our attention to *Miera v. Industrial Commission*, 728 P.2d 1023 (Utah 1986), in which our Supreme Court held that "jump[ing] into an eight-foot hole from a four-foot platform at thirty-minute intervals"[5] was an unusual activity that satisfied the heightened legal cause standard. *Id.* at 1024–25. As JBS points out, the circumstances surrounding the jumps in *Miera* are distinguishable from the jump in the present case. Apart from the approximately eight-inch difference in height between the jumps in *Miera* (48 inches) and the one Foster undertook (40 inches),[6] Foster completed a single jump where *Miera* involved a total of sixteen jumps over a four-hour period. *Id.* at 1024. *See Fastenal*, 2020 UT App 53, ¶¶ 15–16 (stating that "[r]epetition of a workplace activity can constitute an objectively

---

4. Because Foster had no preexisting injury to her left knee, the heightened standard of legal causation does not apply to that injury. JBS does not contend otherwise.

5. To clarify, this involved two consecutive four-foot jumps. The first jump was "four feet onto the shelf," followed by a second jump into the bottom of the eight-foot hole. *Miera v. Industrial Comm'n*, 728 P.2d 1023, 1024 (Utah 1986). This was done "a total of eight times at thirty-minute intervals." *Id.*

6. We do not mean to suggest that a jump from under a certain threshold height cannot be unusual as a matter of law. Instead, each jump (like any other action) must be evaluated in light of the totality of the circumstances. *See Murray v. Labor Comm'n*, 2013 UT 38, ¶ 47, 308 P.3d 461 ("[I]n determining whether the employment activity that precipitated [an] injury was unusual . . . , we must consider the totality of the circumstances.").

unusual or extraordinary exertion" and discussing *Miera* in that context). Significantly, however, the jumps in *Miera* were planned events, capable of care in execution and, presumably, improvement in execution with practice, while Foster's jump was not planned and was the product of an emergency. Accordingly, *Miera* is not dispositive of this case.

¶18   JBS asserts that Foster's action was similar to the everyday activity of "jumping down from a truck bed or from a low wall."[7] And because Foster "did not jump directly from [the] cab of the truck to the ground," but instead "made the first step out of the cab and then took the jump," JBS asserts that such an action "is similar to a person lowering himself down before mak[ing] the jump" from a truck bed. We disagree.

¶19   Foster's jump is not comparable to the activity JBS describes. As an initial matter, Foster did not merely jump down from the cabin of the truck. The Commission specifically found, with our emphasis, that Foster "jump[ed] *away* from the truck." And more importantly, the exigent circumstances surrounding

---

7. Citing a study, JBS also asserts that "[i]t is common for truck drivers to jump down from their cabs without the use of hand [rails], despite recommendations to use the three point stance." *See* Fadi A. Fathallah & John P. Cotnam, *Maximum Forces Sustained During Various Methods of Exiting Commercial Tractors, Trailers and Trucks*, 31 Applied Ergonomics 25, 25–33 (2000). But this assertion is limited to the *employment* context, and it does not address whether such an activity (or something comparable) is "generally expected of people in today's society" outside of the trucking industry. *Murray*, 2013 UT 38, ¶ 48 (quotation simplified). Moreover, as will be discussed, Foster did not, as JBS asserts, merely "jump down" from the cab of the truck. Rather, she jumped *away* from the truck under exigent circumstances that compelled her to do so without the usual care one might take when undertaking a routinized jump that is "all in a day's work."

the jump caused Foster to hurry and prevented her from taking the precautionary measures not to land awkwardly that individuals under JBS's analogous activity typically would have taken. JBS has not suggested an analogous activity *expected of the general public* that would include these additional important circumstances, and we likewise struggle to conceive of such an activity. We therefore conclude that Foster's jump constituted an unusual exertion that readily satisfied the heightened legal cause standard required for individuals with preexisting conditions.

CONCLUSION

¶20 JBS has not carried its burden of persuasion in challenging the Commission's factual findings. And having considered the totality of the circumstances surrounding Foster's jump, we hold that the Commission correctly determined that Foster satisfied the heightened standard of legal causation. Accordingly, we decline to disturb the Commission's order.

---