**2020 UT App 20**

## THE UTAH COURT OF APPEALS

WASATCH ELECTRIC DYNALECTRIC COMPANY AND
AMERICAN CASUALTY COMPANY OF READING, PA,
Petitioners,
*v.*
LABOR COMMISSION AND WENDELL BENWARD,
Respondents.

Opinion
No. 20190398-CA
Filed February 13, 2020

Original Proceeding in this Court

Brad J. Miller and Trent D. Holgate, Attorneys
for Petitioners

Gary E. Atkin and K. Dawn Atkin, Attorneys for
Respondent Wendell Benward

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1      Wendell Benward was electrocuted while maintaining electrical power lines. He survived, but his injuries were so severe that doctors found it necessary to amputate both of his feet. Because of his injuries, Benward qualified for and received workers' compensation benefits. Despite his injuries, however, Benward eventually was able to go back to work, albeit in a different capacity. His former employer, Wasatch Electric Dynalectric Company (Wasatch), does not think it should have to pay Benward permanent total disability benefits for time periods in which Benward was able to work. Under applicable Utah law, Wasatch's argument would be a winner with regard to most injured workers, who ordinarily lose eligibility for permanent total disability benefits if they are able to return to

work. But Utah law carves out an exception for workers who have lost limbs or eyes in a workplace accident, and considers such workers permanently disabled and entitled to permanent total disability benefits even if they are later able to return to work. We therefore reject Wasatch's arguments, and decline to disturb the decision of the Labor Commission (the Commission), which ordered Wasatch to continue to pay benefits to Benward and refused to allow Wasatch to offset the wages it paid Benward post-accident.

## BACKGROUND[1]

¶2     On July 23, 2012, Benward was working as part of a team tasked with maintaining a set of electrical power lines. According to Benward, the team was transporting a large pole when Benward observed that the grounded pole was too close to a live power line. Benward rushed over to help, but tripped and twisted his ankle just before reaching them. As he regained his footing, electricity suddenly arced between the pole and the nearby power line. Somehow, the electricity jumped to Benward's left arm, and the current passed through his body and exited through both of his feet, causing significant injury.

¶3     Benward was evacuated from the scene by helicopter and taken to a hospital, where doctors determined that his injuries required the amputation of both feet. The amputation was performed that same day. In addition to the loss of his feet, Benward also suffered second- and third-degree burns over much of his upper body, as well as hearing loss, sleep apnea,

---

1. "We state the facts and all legitimate inferences drawn therefrom in the light most favorable to the agency's findings." *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 2 n.1, 211 P.3d 382 (quotation simplified).

tinnitus, meniscus tears in both knees, and memory loss, among other ailments.

¶4 After nearly a year, Benward recovered sufficiently to return to work on a part-time basis, although not in the same capacity. With some retraining, Benward was able to work as a safety manager, and he performed those duties for Wasatch on a part-time basis for a few months. Then, in January 2014, Benward was able to increase his hours to full time, and continued to work as a full-time safety manager until Wasatch laid him off, for unrelated reasons, in January 2017. After being laid off, Benward was eventually able to find similar employment as a safety professional at an electrical engineering company specializing in high-voltage power installation. Although the work is inconsistent and the wages and benefits are project-dependent, Benward now earns a weekly wage that is even higher than the wage he earned at Wasatch.

¶5 In addition to the part-time and full-time salary Benward has earned since the date of the accident, Wasatch (or its insurance company) also paid Benward workers' compensation benefits. Beginning on the day following the accident, Wasatch paid Benward temporary total disability benefits until Benward was able to resume part-time work. While Benward was working part-time, Wasatch paid Benward—in addition to his part-time wages—temporary partial disability benefits. After Benward resumed full-time employment, Wasatch paid Benward permanent partial disability benefits, based on a forty-nine percent whole person impairment rating, until it laid Benward off in 2017. In total, Wasatch paid Benward $130,818.68 in various types of workers' compensation benefits between the date of his accident and the date he was laid off.

¶6 In March 2017, after being laid off, Benward filed a claim for permanent total disability benefits stemming from the loss of both of his feet. In this claim, Benward asserted that he was

entitled to continuing permanent total disability benefits from the date of his accident, and continuing for the rest of his life, regardless of the fact that he was able to return to work after the accident as a safety manager. In response, Wasatch acknowledged that Benward met the criteria for permanent total disability under Utah's workers' compensation statute, given the amputation of both of his feet, and that he should receive benefits for the time periods in which he was fully or partially unable to work. However, Wasatch asserted that Benward was not entitled to permanent total disability benefits once it was demonstrated that he was again capable of gainful employment.

¶7 An administrative law judge (ALJ) ruled in favor of Wasatch, determining that Benward's injury created only a "presumptive finding" that he was permanently and totally disabled, and that this presumption was rebutted by the fact that Benward had returned to work. The ALJ concluded that Wasatch was not obligated to pay Benward permanent total disability benefits during periods in which he was gainfully employed.

¶8 Benward appealed the decision to the Commission, which reversed the ALJ's legal determination, concluding that Benward was entitled to permanent total disability benefits even after returning to work, and stating as follows:

> The Commission recognizes that awarding permanent total disability compensation to Mr. Benward for a period during which he was working may seem counterintuitive; however, neither gainful employment nor the ability to work are part of the criteria under § 413(9) as they are under § 413(1). The unique criteria found in § 413(9) provide for a final award of permanent total disability compensation without regard for or consideration of the claimant's interim work following the loss described in that subsection.

However, the Commission noted that Benward would not be entitled to permanent total disability benefits during the time he worked for Wasatch, if his wages had not really been earned but had merely been "intended to be paid in lieu of disability compensation." The Commission remanded the case back to the ALJ for a factual determination about whether the money paid to Benward while he was employed by Wasatch post-accident was "intended as a substitute for disability compensation or as regular compensation for the work performed."

¶9     On remand, the ALJ found that Benward "was paid during the relevant time period for actual work for which [he] earned the wages he was paid," that his job "was not a make-work job" and "was legitimate and not just to avoid permanent total disability benefits," and that Benward "gave a dollar's worth of labor for every dollar he was paid." The Commission affirmed the ALJ's factual findings, and concluded that Wasatch acquired an ongoing obligation to pay Benward permanent total disability benefits starting on the date of his accident and continuing for the remainder of Benward's life, and that—although Wasatch was entitled to an offset for the $130,818.68 that it had already paid Benward for other types of workers' compensation benefits—Wasatch was not entitled to an offset for what it had paid him in wages after the accident.

ISSUE AND STANDARD OF REVIEW

¶10    Wasatch now seeks judicial review of certain aspects of the Commission's order. Wasatch does not seek judicial review of any factual findings made by the ALJ or the Commission, and does not dispute the fact that it has a workers' compensation obligation to Benward for at least the time periods in which Benward was unable to work due to his injuries. However, it asserts that it has no obligation to pay permanent total disability benefits to Benward during periods of time in which Benward was or is gainfully employed, and that it should be entitled to

offset the wages it paid to Benward post-accident against its workers' compensation obligation to Benward. Thus, the issues Wasatch raises in this case are legal in nature, and involve the meaning and interpretation of Utah's workers' compensation statutes. In this context, we review the Commission's legal determinations for correctness. *See Esquivel v. Labor Comm'n*, 2000 UT 66, ¶ 13, 7 P.3d 777 (stating that "[m]atters of statutory construction are questions of law that are reviewed for correctness" (quotation simplified)); *see also Intermountain Slurry Seal v. Labor Comm'n*, 2002 UT App 164, ¶ 4, 48 P.3d 252 (stating that, when reviewing the Commission's resolution of a question of law, we give "no deference" to the "agency's determination, because the appellate court has the power and duty to say what the law is and to ensure that it is uniform throughout the jurisdiction" (quotation simplified)).

ANALYSIS

¶11    For most injured workers—those who have not lost limbs or eyes—permanent total disability benefits under Utah's workers' compensation statutes are available only if the worker proves, by a preponderance of the evidence, the existence of six elements: (1) that he "sustained a significant impairment" as a result of a work-related injury; (2) that he "is not gainfully employed"; (3) that he has an impairment that limits his "ability to do basic work activities" and (4) prevents him from "performing the essential functions of the work" for which he was qualified prior to his accident; (5) that he "cannot perform other work reasonably available"; and (6) that "the industrial accident or occupational disease is the direct cause of the employee's permanent total disability." *See Oliver v. Labor Comm'n*, 2017 UT 39, ¶ 15, 424 P.3d 22 (quoting Utah Code Ann. § 34A-2-413(1)). In this case, given that he is now able to work full-time, and has been since at least 2014, Benward cannot meet this test, and does not argue that he can.

¶12    Instead, Benward points to subsection (9) of that same statutory provision, and asserts that there exists a second and alternative path to proving permanent total disability, one that exists only for workers who sustained a catastrophic injury involving the loss of limbs or eyes, and one that does not consider whether the worker can return to work. That provision reads, in its entirety, as follows:

> (a) The loss or permanent and complete loss of the use of the following constitutes total and permanent disability that is compensated according to this section:
>
> (i)    both hands;
> (ii)   both arms;
> (iii)  both feet;
> (iv)   both legs;
> (v)    both eyes; or
> (vi)   any combination of two body members described in this Subsection 9(a).
>
> (b) A finding of permanent total disability pursuant to Subsection 9(a) is final.

Utah Code Ann. § 34A-2-413(9) (LexisNexis 2019).[2]

¶13    We have interpreted this statutory subsection once before, in *Intermountain Slurry Seal v. Labor Commission*, 2002 UT App 164, 48 P.3d 252. In that case, we noted that Utah's workers' compensation statute sets forth "two avenues" that are "available for an employee to demonstrate the existence of a permanent, totally disabling condition." *Id.* ¶ 7. Under the first avenue, set forth in section 34A-2-413(1) of the Utah Code, the

---

2. Because the relevant sections of the statute have not changed since the date of the administrative proceeding in question, we cite the current version of the Utah Code for convenience.

injured worker must meet the six-part test discussed above. *Id.* The second avenue, set forth in subsection (9) of that same statute, is available only to workers who have lost two limbs or eyes, and under that avenue the worker does not have to make the six-part showing detailed in subsection (1). Instead, "if an employee suffers one of the combination of injuries articulated in subsection [(9)],[3] there is a conclusive presumption that the employee is permanently and totally disabled." *Id.* ¶ 9. Indeed, we stated that "[o]ur reading of the plain language of subsection [(9)] evidences a clear intent to separate the injuries enumerated under subsection [(9)] from other injuries that may also result in an award of permanent total disability benefits." *See id.* ¶ 11; *see also id.* ¶ 14 (stating that "the legislature carefully [chose] to immunize subsection [(9)] claims from the rigorous requirements applied to all other [workers' compensation] claims"). We noted that workers attempting to use the subsection (9) avenue in proving that they suffered a permanent total disability "need show nothing more than the existence of an injury listed within subsection [(9)] and that the injury was the result of an industrial accident," and that such an employee "is not required to establish that he is totally disabled as all other claimants are required to do pursuant to" subsection (1). *Id.* ¶ 11.

¶14 Moreover, we emphasized that a subsection (9) claimant's entitlement to permanent total disability benefits is final, and not

---

3. In *Intermountain Slurry Seal v. Labor Commission*, 2002 UT App 164, 48 P.3d 252, we refer to "subsection (10)" as the relevant subsection. Since our opinion in *Intermountain Slurry Seal*, the legislature removed one of the earlier-listed statutory subsections, rendering the former subsection (10) now subsection (9), and when quoting *Intermountain Slurry Seal*, we use the current subsection number. The relevant statutory language, although now numbered differently, remains substantively unchanged.

"subject to the same rehabilitation provisions as a disability finding under subsection (1)." *Id.* ¶ 10. "Once a subsection [(9)] claimant has established a qualifying injury, there is a conclusive presumption that the claimant/employee is permanently totally disabled and no further findings are required." *Id.* ¶ 12. We concluded by stating that "the plain language of the statute clearly establishes that total permanent disability benefits awarded pursuant to subsection [(9)] are not subject to, nor controlled by, the claimant/employee's limitations or employability." *Id.*[4]

¶15 Wasatch makes no effort to distinguish *Intermountain Slurry Seal*, or to argue that it is inapplicable, and does not ask us

---

4. More than seventeen years have passed since our decision in *Intermountain Slurry Seal*, and in that time span, while the legislature has made certain changes to section 34A-2-413 of the Utah Code, it has not substantively changed the language of subsection (9), nor has it made any other changes that would indicate a legislative belief that our opinion in *Intermountain Slurry Seal* was inconsistent with legislative intent. Because we presume that the legislature is aware of judicial interpretations of statutes, we in turn may presume that the legislature's choice, over the course of nearly two decades, not to amend the statute to supersede *Intermountain Slurry Seal* indicates an acceptance of our interpretation. *See Rutherford v. Talisker Canyons Fin. Co.*, 2019 UT 27, ¶ 62, 445 P.3d 474 (noting the significance of the fact that, "in the years since *Clover* was decided, the legislature has not amended the [relevant statute] to overrule the holding of *Clover*"); *United States Smelting, Refining & Mining Co. v. Nielsen*, 430 P.2d 162, 167 (Utah 1967) (Ellett, J., dissenting) (noting that a previous holding was twenty-seven years old, and that "the Legislature by not changing this statute would have given its tacit approval to the interpretation placed thereon" by the previous holding).

to reexamine the holding we rendered in that case.[5] Instead, Wasatch makes generalized arguments that Benward's interpretation of the statute leads to an "absurd result" that "exceeds the bounds of reasonableness and rationality" and would result in a "windfall" to Benward. But we are bound by *Intermountain Slurry Seal*, and—absent a disavowal or overruling of that case, something Wasatch does not seek here—we must follow the holding and rationale of our prior cases.[6] *See State v. Legg*, 2018 UT 12, ¶ 9, 417 P.3d 592 (stating that, "[u]nder the doctrine of horizontal *stare decisis*, the first decision by a court on a particular question of law governs later decisions by the same court," that "one panel on the court of appeals owes great deference to the precedent established by a different panel on the court of appeals," and clarifying that "[t]he doctrine of horizontal *stare decisis* applies as between different panels of the court of appeals" (quotation simplified)); *see also In re adoption of B.N.A.*, 2018 UT App 224, ¶ 22, 438 P.3d 10 (stating that "one panel of this court is bound to follow the previous decisions of

---

5. Wasatch cited *Intermountain Slurry Seal* only once in its opening brief, in the context of making a passing reference to the ALJ's and the Labor Commission's rulings. And, after Benward relied heavily upon *Intermountain Slurry Seal* in his brief, Wasatch chose not to file a reply brief.

6. We note, as an aside, that we find the statutory interpretation analysis in *Intermountain Slurry Seal* to be not only binding, but also persuasive. *See* 7 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 83.08 (2014) (stating that "[s]pecial statutory provisions may supersede the general principles controlling the relation between medical and wage loss factors in determining total disability," and that "[t]he commonest example of this type of statute is the familiar provision that certain combinations of losses of members shall be presumed to constitute total disability").

another panel of this court, unless we make a specific decision to overrule or disavow the earlier precedent").

¶16　In this case, there is no dispute that Benward meets the requirements of subsection (9) for demonstrating permanent total disability. The parties to this case have stipulated that Benward's workplace accident arose out of the course and scope of his employment with Wasatch, and that, as a result of that accident, he sustained the loss of both of his feet. And under subsection (9), Benward need show nothing more. *See* Utah Code Ann. § 34A-2-413(9)(a); *see also Intermountain Slurry Seal*, 2002 UT App 164, ¶ 11 (stating that a subsection (9) claimant "need show nothing more than the existence of an injury listed within subsection [(9)] and that the injury was the result of an industrial accident"). He has proven that he was permanently and totally disabled, and under subsection (9), that status is "final" and does not change even if Benward is at some point able to return to the workforce. *See* Utah Code Ann. § 34A-2-413(9)(b); *see also Intermountain Slurry Seal*, 2002 UT App 164, ¶ 12 (stating that "[o]nce a subsection [(9)] claimant has established a qualifying injury, there is a conclusive presumption" of permanent total disability that is not "controlled by" future "employability").

## CONCLUSION

¶17　The plain language of the relevant statutory subsection, as interpreted by this court in *Intermountain Slurry Seal*, compels the conclusion that Benward is entitled to permanent total disability benefits, even if he is now capable of working. To the extent Wasatch finds that conclusion absurd or unreasonable, Wasatch would be better served to direct its complaints to the Utah Legislature. Because we are obligated to apply both the statute as written as well as our own prior case law, we decline to disturb the decision of the Labor Commission.