2020 UT App 128

## THE UTAH COURT OF APPEALS

SHAWN WHITE,
Petitioner,

*v.*

LABOR COMMISSION AND GOLDEN EMPIRE MANUFACTURING,
Respondents.

Opinion
No. 20190782-CA
Filed September 11, 2020

Original Proceeding in this Court

Loren M. Lambert, Attorney for Petitioner

Bret A. Gardner and Kristy L. Bertelsen, Attorneys
for Respondent Golden Empire Manufacturing

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

POHLMAN, Judge:

¶1 Shawn White seeks judicial review of the Labor Commission's decision denying him workers' compensation benefits. He raises several arguments on review, including that the Commission's Appeals Board (the Board) erred in concluding that he had not demonstrated that his injury was legally caused by his employment. For the reasons discussed below, we decline to disturb the Board's decision.

## BACKGROUND

¶2 In 2016, White sustained a left knee injury while working for his employer, Golden Empire Manufacturing (Golden). He later applied for a hearing with the Labor Commission in

relation to his injury, claiming entitlement to, among other things, temporary total disability compensation and permanent partial disability compensation under the Utah Workers' Compensation Act. White claimed that while inspecting a steel beam resting on two welding tables, he injured his left knee when he "hit [his] foot" on a "block of wood that was six inches tall," causing his "foot and knee to twist." From this, he claimed that he sustained "multiple tears in the meniscus in [his] left knee."

¶3    As part of discovery, Golden scheduled a medical evaluation (ME) of White. *See generally* Utah Code Ann. § 34A-2-602(1) (LexisNexis 2019) (providing that "an administrative law judge may require an employee claiming the right to receive compensation under this chapter to submit to a medical examination at any time"); Utah Admin. Code R602-2-1(F)(3) ("Upon reasonable notice, the respondent may require the petitioner to submit to a medical examination by a physician of the respondent's choice."). Before White would agree to submit to the ME, however, White requested several revisions to the physician's consent form, and he declined to sign the disclosure authorization form. In response, Golden moved to compel White's attendance at the ME and his cooperation in completing and signing the forms. The Administrative Law Judge (the ALJ) granted Golden's motion, ordering White to "attend and cooperate" with the ME, including "expect[ing] to sign" forms required by the ME examiner as part of the exam.

¶4    Following an evidentiary hearing on his claim, the ALJ referred the case to a medical panel. Noting that there was a medical dispute about whether White had a preexisting disease in his left knee that contributed to his left knee injury, the ALJ instructed the medical panel to answer whether the work accident aggravated or contributed to any preexisting condition. The medical panel opined that before the accident, White had been suffering from "chronic degenerative joint disease of the

left knee," which had been "symptomatic prior to the work accident," and that the accident "likely aggravated his chronic pre-existing left knee" condition. On this basis, and using the Utah Labor Commission's 2006 Supplemental Impairment Rating Guides (USIRG), the panel opined that the accident caused a "2% lower extremity impairment, for a whole person impairment of 1%." Although White timely objected to the medical panel's use of the USIRG and its impairment rating opinion, he did not object to the panel's opinion that he had a preexisting condition that contributed to his injury.

¶5     In his Findings of Fact and Conclusions of Law, the ALJ admitted the medical panel report into evidence and found that "a preponderance of the evidence supports the conclusions of the medical panel report." In particular, the ALJ determined that the "panel's conclusion that Mr. White aggravated his preexisting left knee condition" was supported by the evidence, as was the panel's impairment rating conclusion. Based on this, the ALJ "adopt[ed] the conclusions of the medical panel report."

¶6     On the issue of legal causation, the ALJ determined that a heightened standard applied because White suffered from a preexisting knee condition that contributed to the injury. *See Allen v. Industrial Comm'n*, 729 P.2d 15, 25–27 (Utah 1986) ("[W]here the claimant suffers from a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to prove legal causation."). In applying that standard, the ALJ first described the activity leading to White's injury:

> Mr. White held a tape measure in his right hand, which was hooked on the end of a beam, and he was walking backwards and sideways, while maintaining tension on the measuring tape. While walking backwards, Mr. White's right leg tripped on a sticker (a block of wood that was six inches

tall), which caused him to shift his weight to his left knee, resulting in a twisting and grinding motion in the left knee. Mr. White did not strike his left knee or any part of his body on any piece of equipment or the ground. Mr. White did not fall to the ground after he tripped.

The ALJ next considered whether the work activity that caused the injury was "objectively unusual or extraordinary." He determined that White's tripping and stumbling was not an unusual or extraordinary exertion above that encountered in everyday life. On that basis, the ALJ concluded that White had not "satisf[ied] the higher standard of legal causation under *Allen*" and dismissed his application.

¶7    White moved for Board review of the ALJ's decision. Among other things, he argued that the ALJ's legal causation analysis was faulty. He also argued that, while the ALJ had authority to order his attendance at an ME, he did not have authority to require him to sign the associated release forms.

¶8    The Board adopted the ALJ's findings of fact, determined the legal causation issue "to be dispositive" of the case, and declined to reach the other issues White raised. Like the ALJ, the Board determined that White had a preexisting condition in his left knee and that, accordingly, "the more stringent standard of legal causation" applied. And "[a]fter reviewing the evidence presented along with the totality of the circumstances surrounding the work accident," the Board concluded that the work activity "did not involve an unusual or extraordinary exertion above the usual wear and tear of nonemployment life." Specifically, the Board stated that "[i]t is not unusual for an individual to take steps backwards and then stumble and shift one's weight to avoid falling down." On this basis, the Board affirmed the ALJ's decision to deny White's claim for benefits.

¶9    White seeks review of the Board's decision to deny benefits.

ISSUES AND STANDARDS OF REVIEW

¶10    White raises two issues for review. First, he argues that the Board should have concluded that he established legal causation because the work activity leading to his injury was unusual or extraordinary as compared to conditions encountered in everyday life. This "presents a traditional mixed question of law and fact." *Murray v. Labor Comm'n*, 2013 UT 38, ¶ 24, 308 P.3d 461. Because "the ultimate question is the legal effect of the facts" with respect to whether the activity was objectively unusual or extraordinary, we are "in a better position to analyze" the issue than the Board, and our review is accordingly non-deferential. *Id.* ¶¶ 40, 48; *accord Oceguera v. Labor Comm'n*, 2020 UT App 83, ¶ 8, 468 P.3d 544.

¶11    Second, White argues that the ALJ erred by requiring him to sign the consent and disclosure forms attendant to the ME. More specifically, White challenges the ALJ's authority to "force" him to "enter a personal contract with [Golden] and its [ME] examiner" and "relinquish his constitutional privacy, common-law, and tort rights" by requiring his cooperation with the forms. This presents a question of law, which we review for correctness. *See Wasatch Elec. Dynalectric Co. v. Labor Comm'n*, 2020 UT App 20, ¶ 10, 460 P.3d 1049.[1]

---

1. White also challenges the constitutionality of the USIRG and the propriety of the impairment rating assigned to him. However, because we decline to disturb the Board's legal causation conclusion and denial of benefits, we have no occasion to reach these issues.

ANALYSIS

I. Legal Causation

¶12    Under Utah's Workers' Compensation Act, an employee "who is injured . . . by accident arising out of and in the course of the employee's employment" is entitled to benefits. *See* Utah Code Ann. § 34A-2-401(1) (LexisNexis 2019). An injury is compensable only where the employee can prove that the injury was "by accident" and that there is a causal connection between the injury and the employment. *See id.*; *see also Allen v. Industrial Comm'n*, 729 P.2d 15, 18 (Utah 1986); *Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 334 (Utah Ct. App. 1990). As to causation, an employee must specifically "establish that the conditions or activities of his job were both the medical cause and the legal cause of his injury." *Murray v. Labor Comm'n*, 2013 UT 38, ¶ 45, 308 P.3d 461; *see also Allen*, 729 P.2d at 25.

¶13    White challenges the Board's legal causation conclusion. When the employee does not have a preexisting condition that causally contributed to the workplace injury, the "medical and legal causation requirements are one and the same." *See Murray*, 2013 UT 38, ¶ 45. The employee must "show by evidence, opinion, or otherwise that the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability." *See Allen*, 729 P.2d at 27; *accord Murray*, 2013 UT 38, ¶ 45. But when, as here, the employee has a contributing preexisting condition, the employee must satisfy a heightened legal causation standard. *See Murray*, 2013 UT 38, ¶ 46. This standard requires the employee to prove that "the employment contributed something substantial to increase the risk he already faced in everyday life because of his [preexisting] condition." *Allen*, 729 P.2d at 25.

¶14    As our supreme court explained in *Murray*, evaluating legal causation under this heightened standard is a two-step

process: "first, we must characterize the employment-related activity that precipitated the employees' injury, taking into account the totality of the circumstances; and second, we must determine whether this activity is objectively unusual or extraordinary." 2013 UT 38, ¶¶ 46, 48. "[T]he first step is a matter of fact," looking to the totality of the circumstances surrounding the employee's injury, "including the employee's exertions and the workplace conditions." *Id.* ¶¶ 47–50. The second step requires "compar[ing] the activity that precipitated the employee's injury with the usual wear and tear and exertions of nonemployment life," focusing on "what typical nonemployment activities are generally expected of people in today's society, not what this particular claimant is accustomed to doing." *Id.* ¶¶ 48, 52 (cleaned up).

¶15　We undertake both steps mindful that the heightened standard "is not meant to prevent workers with preexisting conditions from recovering benefits." *Fastenal v. Labor Comm'n*, 2020 UT App 53, ¶ 14, 463 P.3d 90 (cleaned up). Rather, the heightened standard is employed as a method "to distinguish those injuries which coincidentally occur at work because a preexisting condition results in symptoms which appear during work hours without any enhancement from the workplace." *Murray*, 2013 UT 38, ¶ 46 (cleaned up); *Allen*, 729 P.2d at 25 (stating that the heightened legal causation standard "serves to offset the preexisting condition of the employee as a likely cause of the injury, thereby eliminating claims for impairments resulting from a personal risk rather than exertions at work").

¶16　White contends that the circumstances surrounding his accident meet the heightened legal causation standard and that the Board erred in deciding otherwise. He claims that the workplace conditions, combined with the "extreme" twisting and grinding mechanism of the injury, satisfied the higher standard. The Board concluded, after "reviewing the evidence presented along with the totality of the circumstances

surrounding the work accident," that the "work activity in question did not involve an unusual or extraordinary exertion above the usual wear and tear of nonemployment life." We agree.

¶17 To determine whether the Board erred in its legal causation conclusion, we must first "characterize[] the totality" of White's employment-related activity that precipitated his injury. *See Murray*, 2013 UT 38, ¶¶ 48, 51. The facts surrounding the activity as found by the Board are not in dispute on appeal.[2] White was injured while he was inspecting and measuring a steel beam for Golden. The steel beam was "resting on two welding tables," and White measured the beam by "walking backwards while keeping tension in the [measuring] tape." As he did so, White's right leg hit a block of wood "about six inches high," which led to "a twisting and grinding motion of [White's] left knee" as White "shifted his weight to avoid falling." White was able to avoid falling or striking his left knee.

---

2. White argues that the Board focused on the "injury as being a 'trip and stumble,' without regard to the totality of the circumstances." In making this argument, White relies on allegedly "uncontested" facts that were not found by the Board. For example, he claims that he "was crouched" "at an almost 90 degree angle" while walking backwards, that he was "in a confined space, in which there was a 6-inch gap between him and the obstacle that caused him to stumble," and that there "were steel beams causing hazards for a more serious injury to either side of him." But White has not identified where in the record some of these alleged facts were presented, nor has he persuaded us that it is appropriate for us to simply accept them as established even though the Board did not. Further, White has not otherwise challenged the adequacy of the Board's factual findings in this review. We therefore hold him to the facts as found by the Board in evaluating legal causation.

¶18 We must next "determine whether [the] activity," in light of the totality of the circumstances, "is objectively unusual or extraordinary." *Id.* ¶ 48. "Utah courts have deemed employment activities to be 'unusual' or 'extraordinary' when they require an employee to endure jumping, lifting great weight, or repetition." *Id.* ¶ 51. For example, in *Miera v. Industrial Commission*, 728 P.2d 1023 (Utah 1986), our supreme court determined that the activity of "jump[ing] into an eight-foot hole from a four-foot platform at thirty-minute intervals" constituted a "considerably greater exertion than that encountered in non-employment life," *id.* at 1024–25, and in *Stouffer Foods Corp. v. Industrial Commission*, 801 P.2d 179 (Utah Ct. App. 1990), this court concluded that "applying repeated or constant pressure to the grips of high-pressure hoses . . . for hours at a time is not a typical non-employment activity," *id.* at 183–84 (cleaned up).

¶19 This court has also deemed certain employment activities to be unusual or extraordinary if they occur in the context of "peculiar" or "exigent" circumstances. For example, in *Peterson v. Labor Commission*, 2016 UT App 12, 367 P.3d 569, we concluded that "although [the claimant] was not lifting a great amount of weight"—sixteen pounds—"when she was injured," the "awkward" and "peculiar manner" of lifting the weight— "reach[ing] behind her with her arm extended 'like a waiter,' plac[ing] her palm under the tray, lift[ing] the cake tray from shoulder height, and return[ing] forward while lowering the tray to her work table with her supinated and extended arm"— rendered the work activity unusual and extraordinary. *Id.* ¶¶ 15– 16. And, recently, in *JBS USA v. Labor Commission*, 2020 UT App 86, 467 P.3d 905, we concluded that the employee's act of "jumping away from" a semi-truck from a height of "approximately 40 inches," in "exigent circumstances" that caused the claimant "to hurry and prevented her from taking the precautionary measures not to land awkwardly," constituted an unusual exertion sufficient to satisfy the heightened legal causation standard. *Id.* ¶¶ 3, 16–19.

¶20 Our supreme court's decision in *Murray* is particularly instructive and applicable to the present case. There, the claimant, who suffered from a preexisting back condition, injured his back during work as he "bent over the edge of [a] boat . . . at a thirty-five to forty degree angle, . . . holding [a] cable and [a] lock in his left hand and entering the combination with his right" while "wearing a fifteen-pound service belt and a one-pound inflatable life jacket." 2013 UT 38, ¶¶ 2–4, 49. A "five-to six-inch wave from another boat's wake unexpectedly rocked" the claimant's boat, "causing him to lose his balance," whereupon he steadied himself "by shifting his right foot against the side of the boat, grabbing the side of the boat with his right hand, and twisting his body." *Id.* ¶¶ 49–50.

¶21 Recognizing that the totality of the circumstances surrounding the claimant's injury included "both exertional and nonexertional" activities, our supreme court concluded that the activities were not unusual or extraordinary. *Id.* ¶¶ 52–53. The court focused on the objective question of "what typical nonemployment activities are generally expected of people in today's society." *Id.* ¶ 52 (cleaned up). The court observed that, in everyday life, people are generally "expected to withstand minor force," such as that presented through the unexpected wave. *Id.* ¶¶ 52–53. The court then compared the activities at issue to activities associated with traveling, such as carrying heavy, clumsy luggage and encountering "bumpy rides in planes or buses," yet nevertheless "maintain[ing] and regain[ing] . . . balance in the process." *Id.* ¶ 53. And the court concluded, despite the claimant's "awkward position" and the "service belt and jacket he was wearing when the small wave rocked his boat," that the activities and circumstances at issue were nevertheless of a kind usually encountered in everyday life. *Id.* ¶¶ 52–53. On this basis, the supreme court affirmed our decision upholding the Commission's order denying benefits. *Id.* ¶ 53.

¶22 In the present case, we likewise conclude that the work activities at issue were "typical nonemployment activities . . . generally expected of people in today's society." *See id.* ¶ 52 (cleaned up). White was injured while walking backward, focused on a task other than the mere act of walking, and then stumbling on a protruding object, shifting his weight, and stabilizing himself. As in *Murray*, these activities are not like those our courts have typically determined to be unusual or extraordinary, such as those involving "jumping, lifting great weight, or repetition." *Id.* ¶ 51. Nor do they involve "exigent" or "peculiar" circumstances. *See JBS USA*, 2020 UT App 86, ¶¶ 16–19; *Peterson*, 2016 UT App 12, ¶ 16. Rather, these activities are comparable to those "generally expected" of persons in everyday life. *Murray*, 2013 UT 38, ¶ 52 (cleaned up). People in everyday life are generally expected to multitask while walking and to steady themselves when stumbling on something unexpected in their path. Indeed, it is not unusual for persons undertaking simple home improvement or gardening projects to encounter circumstances similar to those surrounding White's injury—those involving measuring-like tasks, inadvertent stumbling on objects in the way, and a need to steady themselves before continuing on. The traveling example in *Murray* is also apropos, because when traveling, passengers are routinely expected to navigate narrow aisles while handling clumsy, heavy luggage—articles much more difficult to handle than a tape measure—and to steady themselves upon being jostled or meeting an unexpected force. *See id.* ¶ 53.

¶23 In short, we conclude that, given the totality of the circumstances present in this case, the "whole of [White's] accident entailed nothing unusual or extraordinary that could be presumed to have contributed something substantial to increase the risk of injury." *See id.* (cleaned up). Accordingly, we decline to disturb the Board's order affirming the ALJ's decision and denying benefits.

II. Consent and Disclosure Forms

¶24   White also challenges the ALJ's order[3] that, in association with attending the ME, he was expected to sign consent and disclosure forms required by the examiner "as part of his cooperation with the [ME]." He claims that the ALJ had "no legal authority" to "force [him] to enter a personal contract with [Golden] and its [ME] examiner" or "to waive" certain "tort, civil, and privacy" rights "when [he was] subjected to [an ME]." On this basis, he asks that we "enjoin all ALJs from requiring petitioners to contract with [MEs] to waive" their rights when subjected to an ME.

¶25   White has not persuaded us that he is entitled to the relief he seeks. To begin with, White has not shown that he suffered harm from being ordered to cooperate in the discovery process, including submitting to the ME and being expected to sign "a particular disclosure form" required by the examiner. We are unable to grant relief from an agency action unless the alleged error "substantially prejudiced" the "person seeking judicial review," Utah Code Ann. § 63G-4-403(4) (LexisNexis 2019), and White carries the burden to demonstrate substantial prejudice, *see Macfarlane v. Career Service Review Office*, 2019 UT App 133, ¶¶ 42–43, 450 P.3d 87. "A person is substantially prejudiced by

---

3. The ALJ ordered White's cooperation in signing the consent and disclosure forms associated with the ME. In his motion for Board review, White argued that by requiring him to sign the forms, the ALJ improperly forced him to waive common law, tort, and constitutional privacy rights. The Board declined to reach this issue in its affirmance of the ALJ's decision to deny benefits, determining that the legal causation issue was dispositive and that the Commission in general had no authority to consider constitutional challenges. As a result, the order on which this challenge is based is the ALJ's, not the Board's.

an agency action if that challenged action was not harmless." *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 31, 428 P.3d 26. "An error will be harmless if it is sufficiently inconsequential that there is no reasonable likelihood that the error affected the outcome of the proceedings." *Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758 (cleaned up).

¶26    While White details the problems he perceives with the consent and disclosure forms and generally lists various ways in which the forms purported to require him to contract with the ME examiner and to waive certain rights, he does not identify a legal basis for the exceptional remedy he seeks, nor does he demonstrate any harm.

¶27    First, while White generally asserts that the ALJ had no authority to force him to waive certain of his rights, he provides no authority or analysis suggesting why—or, more fundamentally, whether—it would be at all appropriate for us to take the rather extraordinary step of entering a permanent injunction barring "all ALJs" from requiring any petitioner to sign a consent or disclosure form in conjunction with an ME. *See generally System Concepts, Inc. v. Dixon*, 669 P.2d 421, 425 (Utah 1983) ("Injunction, being an extraordinary remedy, should not be lightly granted . . . ."). For this reason alone, his argument fails.

¶28    Second, even if we construe White's argument as a challenge to the Board's ultimate determination, he has not shown that the ALJ's order affected the outcome of his case. For one, it is unclear from the record whether White was required to sign, and did sign, the very forms he objected to in completing the ME. It is certainly possible that he was asked to sign them and he did. But in his opening brief's addenda, White provides only the unsigned, marked-up version of the consent form and the crossed-out version of the disclosure form. He does not otherwise direct us to signed forms in the record, and in our

review, we have been unable to find any confirmation that the forms he objected to were eventually signed without alteration.

¶29    Further, even if we assume White signed the very same consent and disclosure forms he objected to, he makes no argument that signing the forms affected the merits of his case, the medical panel's evaluation of his injury, or the ALJ's and the Board's decisions about his entitlement to benefits. Similarly, he makes no argument that by signing the consent form, he was prevented (or had a substantiated basis from which to anticipate being prevented) from pursuing actual legal action and relief related to any harms he suffered during the ME itself. In short, White has not shown that he suffered actual prejudice by being ordered to cooperate with the ME process.

¶30    For these reasons, we decline to grant White the relief he seeks on this issue.

CONCLUSION

¶31    We decline to disturb the Board's decision to deny White benefits. White has not established that the work activities at issue satisfied the heightened legal causation standard applicable to the circumstances. White also has not shown any harm arising out of or entitlement to the relief he seeks regarding the ME consent and disclosure forms.

——————