**2020 UT App 170**

# THE UTAH COURT OF APPEALS

SUSAN M. WATSON,
Petitioner,

*v.*

LABOR COMMISSION, HORIZON HOME HEALTH, AND
AMERICAN LIBERTY INSURANCE,
Respondents.

Opinion
No. 20200231-CA

HORIZON HOME HEALTH AND AMERICAN LIBERTY INSURANCE,
Petitioners,

*v.*

LABOR COMMISSION AND SUSAN M. WATSON,
Respondents.

Opinion
No. 20200297-CA
Filed December 24, 2020

Original Proceedings in this Court

Loren M. Lambert, Attorney for Susan M. Watson

Chad P. Curtis, Attorney for Horizon Home Health
and American Liberty Insurance

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1     Susan M. Watson and Horizon Home Health (Horizon)
both seek review of the Utah Labor Commission's award of
temporary total disability benefits and medical expenses to

Watson based on a workplace injury.[1] Watson argues that the Commission erred in not awarding her permanent total disability, while Horizon argues that the Commission erred in not completely denying Watson's claim for benefits due to a pre-existing condition. We decline to disturb the Commission's order in either respect.

BACKGROUND[2]

¶2　On June 1, 2015, while working for Horizon as an in-home nurse, Watson arrived at the home of a severely disabled toddler (Toddler) for whom she provided care. Toddler suffers from a syndrome that stunts the growth of the joints in her body,

---

1. We are resolving Watson's and Horizon's petitions for review in one opinion for efficiency. If this were an appeal from a court proceeding, one party would typically appeal an adverse decision and the opposing party would then have the option to cross-appeal any decision below that was also adverse to its interests, resulting in a single appellate case and less briefing. *See* Utah R. App. P. 4(d). But because the rules of appellate procedure do not allow for a cross-petition in the administrative context, akin to a cross-appeal in a judicial proceeding, each party must file its own petition for review if they both wish to contest the administrative agency's ruling, allowing, in essence, two "appeals" from a single case. *See id.* R. 18 (stating that rules 3–8 are not applicable to judicial review of administrative orders). This encourages inefficiency, and the Supreme Court's Advisory Committee on the Rules of Appellate Procedure may wish to consider amending the rules to allow cross-petitions for review in administrative cases.

2. "In reviewing an order from the Commission, we view the facts in the light most favorable to the Commission's findings and recite them accordingly." *O'Connor v. Labor Comm'n*, 2020 UT App 49, n.1, 463 P.3d 85.

causing them to contract and resulting in Toddler's body, including her legs and arms, becoming "distorted." To assist her breathing, Toddler had undergone a tracheotomy, which left a hole through the front of her neck into her trachea that was connected to a respirator via a tube. Upon Watson's arrival, she witnessed Toddler in her bed "covered from head to toe with diarrhea." Watson became alarmed because Toddler could experience life-threatening complications if excrement entered the tracheotomy hole.

¶3    In response to this medical emergency, Watson immediately picked up Toddler, who weighed approximately 25 pounds, and rushed up a flight of stairs to a bathroom to clean her off as quickly as possible in an attempt to prevent the excrement from entering Toddler's tracheotomy tube. Watson "carried [Toddler] with her left hand cradling [Toddler's] head and shoulders and her right hand supporting [Toddler's] bottom," which "was a little different than [carrying] a regular child because [Toddler's] bottom was twisted out of alignment with her torso and her back and head were arched."

¶4    Once in the bathroom, Watson attempted to place Toddler, who was "slippery . . . because she ha[d] stool all over her," onto a shower chair in a shower-bathtub combination, while being careful not to allow any excrement into the tracheotomy tube. To put Toddler in the bathtub, Watson had to sidestep between the toilet and the tub, which were approximately 18 inches apart. As Watson "extended her arms . . . to lay [Toddler] down onto [the] shower chair inside the bathtub that was about 2 feet high, . . . she jerked her head up and to the left to look for the shower head." The moment she did this "she felt a 'hot poker' shock sensation in her neck that travelled down to the base of her spine." Despite the pain, Watson was able to finish cleaning Toddler and then went home, where she began to experience numbness and tingling in her extremities.

¶5 Before this accident, Watson had experienced numerous problems in her neck and spine. In 1988, she had a discectomy and decompression surgical procedure, as well as "another surgery in 2002 to fuse vertebrae with plate fixation at the C4-7 levels of her cervical spine." She also suffered two additional neck injuries: one resulting from a car accident in 2009 and another from a workplace accident while working for a different employer in 2013.

¶6 On June 4, 2015, Watson sought medical treatment at a local clinic and was diagnosed "with central canal stenosis at the C3-4 level of her cervical spine with spinal-cord compression and a disc bulge." She was referred to an emergency room and, that same day, "[s]he underwent surgery to remove the previous instrumentation, decompress the nerves at C3-4, and extend the fusion of her cervical vertebrae."

¶7 Soon after this surgery, Watson's longtime treating physician (Treating Physician) examined her. Treating Physician opined that "Watson's neck symptoms were medically caused by the [June 1,] 2015 work accident" but that her "pre-existing neck condition . . . contributed to the injury." Horizon's medical consultant also examined Watson and agreed that "Watson's pre-existing neck condition contributed to her work injury and need for emergency surgery," but he opined that she "would have required surgical intervention at some point regardless of the work accident." Horizon's consultant also stated that Watson should be restricted to lifting 10 pounds, should not do any overhead work, should not drive for work, and should be allowed "frequent position[] changes."

¶8 Watson brought a claim for workers' compensation benefits based on this injury, claiming temporary total disability and permanent total disability. An administrative law judge (the ALJ) held an evidentiary hearing and, given Watson's pre-existing condition, applied the more stringent legal standard of causation laid out in *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986). The ALJ determined that Watson did not meet this

standard and denied her claim for benefits. Watson appealed to the Commission, which determined that Watson satisfied the more stringent standard and therefore set the ALJ's ruling aside with instructions for the ALJ to make determinations regarding Watson's level of disability and the benefits to which she was entitled.

¶9    On remand, the ALJ referred Watson's claim to a medical panel. The medical panel determined that the incident with Toddler "medically caused [Watson] to suffer an acute cervical-disc herniation at the C3-4 level that led to cervical-spine myelopathy." This necessitated surgical treatment, physical and occupational therapy, and medication. The medical panel "assessed [her] with a 20% whole-person impairment rating" as a result of the injury and placed the following work restrictions on her: "no overhead work, no lifting more than 10 pounds, no driving or operating machinery, no patient transfers, no climbing stairs or ladders, and no safety-sensitive work." The medical panel also opined that "[t]his particular injury has not allowed . . . Watson to return to baseline as she suffered a significant spinal canal stenosis that has resulted in continued neurological symptoms that cause her to be unsteady, weak, and have coordination issues."

¶10    The ALJ then held an evidentiary hearing at which Watson testified to the following:

   a. On the six to eight days per month that she was most active, she had to take breaks throughout the day totaling between four and five hours.
   b. On her "good days," she could continuously sit for only 30 to 45 minutes at a time without having to get up.
   c. On her active days, she could stand for only 15 minutes at a time, for a total of an hour and a half per day, at most.

  d. She was limited in the work she could do with her hands because she lost coordination in them and could not feel her fingers.

  e. She used to be able to type sixty words per minute, but after the injury she could not type at all.

  f. Her "pain has been unbelievable," she still could not feel areas of her legs, she had severe pain in her feet and hands, and the pain in her midsection frequently restricted her breathing.

  g. It takes her approximately an hour and a half after she wakes up to be able to balance and navigate around the house.

  h. She allowed her nursing license to expire because she could no longer perform any nursing duties.

  i. She tried for approximately two years to obtain employment as a nurse in a call center but could not even get an interview.

¶11 Following Watson's testimony, a vocational expert (Expert) testified on behalf of Horizon. Expert testified that at the time of Watson's injury, she was qualified to be a nursing director, an audit nurse, an internal review/utilization health nurse, a hospital discharge planning nurse, and a telephonic health nurse—all of which Expert labeled as sedentary jobs. Expert also testified that based on Watson's "medical restrictions," there was nothing "that would keep her from doing the [job of a] nursing service director." Regarding the telephonic health nurse position, Expert stated that it required "very little typing"—typically around nine to twelve minutes in an eight-hour work day—and there is "no speed requirement" for the typing. Regarding the audit nurse position, Expert opined that Watson "could actually sit and stand if the doctor indicated she would be able to look down at a computer screen" so long as no overhead work was required. Expert also testified that the review/utilization nurse position would require Watson

to "review[] information either on a computer screen or [by] . . . actually having a physical file in your hand to go through."

¶12    On cross-examination, Expert explained that these jobs could entail up to a little more than two and a half hours per day of "reaching, fingering, and handling." Expert also stated that Watson's potential inability to maintain her balance would not disqualify her outright, but he opined that "an employer is not going to put up with you [if there is a] risk of you falling," and Watson "probably would not be able to maintain employment if she's falling down." Expert further testified that if Watson "was only able to sit 30 to 45 minutes and would have to get up and walk around and leave the workstation," she would not be able to hold any of the positions he identified.

¶13    Relying on the medical panel's findings on medical causation and the Commission's determination that Watson satisfied the more stringent *Allen* standard for legal causation, the ALJ concluded that Watson was entitled to benefits. But the ALJ determined that she was eligible only for temporary total disability benefits and medical expenses, not for permanent total disability benefits, because she failed to meet all the elements required to sustain such an award under section 34A-2-413(1) of the Utah Code. Both Watson and Horizon appealed to the Commission.

¶14    Before the Commission, Horizon argued that "Watson has not shown that the work accident legally or medically caused her neck injury." The Commission rejected this argument, noting that it had already ruled in Watson's favor with regard to legal causation, and determined that, based on "the opinions of [Treating Physician] and the medical panel," the "preponderance of the evidence shows that . . . Watson's work activities medically caused her neck injury." Watson, in turn, argued that the ALJ erred in not awarding her permanent total disability. The Commission rejected her argument, ruling that under Utah Code section 34A-2-413(1)(b)–(c) and *Provo City v. Labor Commission*, 2015 UT 32, 345 P.3d 1242, Watson failed to establish

three of the six required elements to warrant an award of permanent total disability benefits.

¶15 Watson and Horizon each seek our review of the Commission's decision.

ISSUES AND STANDARDS OF REVIEW

¶16 Watson contends that the Commission's denial of her claim for permanent total disability is not supported by substantial evidence and is therefore not legally sufficient. "A challenge to an administrative agency's findings of fact is reviewed for substantial evidence, and findings of fact are therefore accorded substantial deference and will not be overturned if they are based on substantial evidence, even if another conclusion from the evidence is permissible." *Pritchard v. Labor Comm'n*, 2019 UT App 184, ¶ 10, 453 P.3d 677 (quotation simplified). "Substantial evidence exists when the factual findings support more than a mere scintilla of evidence though something less than the weight of the evidence." *Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 35, 164 P.3d 384 (quotation simplified). And "an administrative law decision meets the substantial evidence test when a reasonable mind might accept as adequate the evidence supporting the decision." *Id.* (quotation simplified).

¶17 Horizon asserts that the Commission erred in ruling that the exertions that led to Watson's injury were sufficiently unusual and extraordinary to meet the heightened standard of legal causation under *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986). This issue "presents a traditional mixed question of law and fact." *Murray v. Labor Comm'n*, 2013 UT 38, ¶ 24, 308 P.3d 461. "And because the ultimate question is the legal effect of the facts, i.e., whether a given set of facts is objectively unusual, rather than witness credibility or demeanor, our review of the ultimate question is non-deferential." *JBS USA v. Labor*

*Comm'n*, 2020 UT App 86, ¶ 8, 467 P.3d 905 (quotation simplified).

¶18   Horizon also argues that the Commission "made factual findings not supported by the evidentiary record." We review the Commission's factual findings "under the substantial evidence standard of review, examining the whole record to determine whether a reasonable mind might accept as adequate the evidence supporting the decision." *Quast v. Labor Comm'n*, 2017 UT 40, ¶ 15, 424 P.3d 15 (quotation simplified).[3]

ANALYSIS

I.

¶19   We begin by analyzing Watson's argument that the Commission erred by not granting her permanent total disability compensation. Under Utah's Workers' Compensation Act, an injured employee must prove all of the following six elements to qualify for permanent total disability benefits: (1) "the employee sustained a significant impairment or combination of impairments as a result of the industrial accident"; (2) "the employee is not gainfully employed"; (3) "the employee has an impairment or combination of impairments that reasonably limit the employee's ability to do basic work activities"; (4) "the industrial or occupationally caused impairment or combination of impairments prevent the employee from performing the essential functions of the work activities for which the employee

---

3. The parties raise additional subsidiary issues. We have considered these issues and, in the context of this case, conclude that they are without merit, and we decline to discuss them further. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989) ("[I]t is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court.").

has been qualified until the time of the industrial accident"; (5) "the employee cannot perform other work reasonably available"; and (6) "the industrial accident . . . is the direct cause of the employee's permanent total disability." Utah Code Ann. § 34A-2-413(1)(b)–(c) (LexisNexis 2019).[4] *See Provo City v. Labor Comm'n*, 2015 UT 32, ¶ 6, 345 P.3d 1242.

¶20 Here, Watson challenges the Commission's determination that she did not meet the final three elements. Because we agree with the Commission that Watson failed to meet the fourth element, which is fatal to her claim, we limit our analysis to that element.

¶21 The fourth element requires an employee to show that "the industrial or occupationally caused impairment or combination of impairments prevent the employee from performing the essential functions of the work activities for which the employee has been qualified until the time of the industrial accident." Utah Code Ann. § 34A-2-413(1)(c)(iii). Watson claims that the Commission erred in this respect because it failed to consider medical evidence in the record in conjunction with Expert's testimony regarding the essential functions of the work for which she was qualified at the time of the accident. Specifically, she claims her testimony about her inability to perform these functions after her accident and the evidence from medical providers in the record—that, among other things, she had difficulty maintaining her balance, experienced loss of coordination, had hand numbness, could lift only 10 pounds, needed frequent position changes, and could not drive while on the job—all necessitated a finding that she met the fourth element. While we are sympathetic to Watson's

---

4. Because the relevant provisions of the Utah Code in effect at the time of Watson's injury do not materially differ from those currently in effect, we cite the current version of the code for convenience.

employability plight in a real-world sense, our standard of review does not allow us to grant her the relief she requests.

¶22    While it is true that all the foregoing evidence was in the record, the Commission found that Watson did not meet the fourth element because "the preponderance of the medical and vocational evidence presented is more persuasive regarding [Watson's] ability to work as a nursing services director than her subjective assertions on her physical limitations" and because there was "no medical opinion in the record—even from . . . Watson's own treating physicians—indicating that she is unable to work despite her complaints of ongoing pain and weakness." The Commission deferred to the medical experts' ultimate conclusions in the record. Specifically, it relied on the medical panel, which placed the following work restrictions on Watson: "no overhead work, no lifting more than 10 pounds, no driving or operating machinery, no patient transfers, no climbing stairs or ladders, and no safety sensitive work." The medical panel examined Watson and was fully aware of the problems from which she suffered but nonetheless placed only the aforementioned restrictions on her,[5] none of which disqualified

---

5. Citing *Guzman v. Labor Commission*, 2015 UT App 310, 365 P.3d 725, Watson claims that the Commission erred in relying on the medical panel's opinion that she could work. Watson's claim on this point is unavailing. In *Guzman*, we held that the Commission "may rely on the medical panel's opinion for only those matters that are within the medical panel's expertise— medical diagnosis and *restrictions*," *id.* ¶ 15 (emphasis added), but the Commission erred in that case because it "relied upon the medical panel's determination that Guzman can work full time in a light to medium work capacity," *id.* ¶ 16. Here, the Commission did not rely on the medical experts' opinion on whether Watson could or could not work. Rather, the Commission simply analyzed the essential functions of the jobs for which she was qualified in conjunction with the *restrictions* the medical panel placed on her. This is permissible.

her from performing the essential functions, as explained by Expert, "of the work activities for which [she had] been qualified until the time of [her] accident." *See id.*

¶23   Therefore, even though another conclusion "from the evidence is permissible," such as the one Watson puts forth, we cannot disturb the Commission's ultimate finding on this claim because it was based on substantial evidence. *See Pritchard v. Labor Comm'n*, 2019 UT App 184, ¶ 10, 453 P.3d 677 (quotation simplified).

## II.

¶24   We next address Horizon's two challenges to the Commission's decision. First, Horizon attacks the Commission's factual finding that "Watson hurriedly bent down and extended her arms outward *while* jerking her head up and to the left." Horizon asserts that the "Commission's findings are ambiguous on whether the two exertions occurred simultaneously, or whether they were two distinct separate exertions." Horizon argues that "to the extent the . . . Commission found the two exertions to have occurred simultaneously, the Commission's findings are not supported under a substantial evidence standard of review" because "[t]he record clearly show[s] that the actions did not occur simultaneously; rather the two exertions in question . . . were two distinct and separate actions unrelated to each other." Horizon's attempt to finely parse the Commission's findings on this point is unavailing. Watson testified that while "in the process of setting [Toddler] on the chair [her] arms were extended," she "noticed that the shower nozzle was not down where [she] could get it," and she then "jerked [her] head up to the left." This testimony supported the Commission's finding that the two exertions occurred simultaneously. Therefore, based on this testimony, "under the substantial evidence standard of review, examining the whole record," we "determine . . . a reasonable mind might accept as adequate the evidence supporting the [Commission's] decision." *See Quast v. Labor Comm'n*, 2017 UT 40, ¶ 15, 424 P.3d 15

(quotation simplified). Accordingly, we decline Horizon's invitation to invalidate the Commission's decision on this basis.

¶25    Second, Horizon claims that the Commission "incorrectly concluded that . . . Watson's exertions were unusual and extraordinary when compared with the usual wear and tear and exertions of nonemployment life." Under Utah's Workers' Compensation Act, an employee "who is injured . . . by accident arising out of and in the course of the employee's employment" is entitled to benefits. *See* Utah Code Ann. § 34A-2-401(1) (LexisNexis 2019). Thus, "an injury is compensable only where the employee can prove that the injury was by accident and that there is a causal connection between the injury and the employment." *White v. Labor Comm'n*, 2020 UT App 128, ¶ 12, 474 P.3d 493 (quotation simplified). The causal connection element requires a showing of both medical and legal causation. *JBS USA v. Labor Comm'n*, 2020 UT App 86, ¶ 14, 467 P.3d 905. Although an employee may generally establish both forms of causation upon demonstrating "by evidence, opinion, or otherwise that the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability," *id.* (quotation simplified), "where the claimant suffers from a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to prove legal causation," *Allen v. Industrial Comm'n*, 729 P.2d 15, 26 (Utah 1986). Under this heightened standard, "[t]o meet the legal causation requirement, a claimant with a preexisting condition must show that the employment contributed something substantial to increase the risk he already faced in everyday life because of his condition." *Id.* at 25. In making this determination, we apply an "objective standard of comparison," focusing "on what typical nonemployment activities are generally expected of people in today's society." *Id.* at 26. This inquiry "involves two steps: first, we must characterize the employment-related activity that precipitated the employees' injury, taking into account the totality of the circumstances; and second, we must determine whether this activity is objectively unusual or extraordinary." *Murray v. Labor Comm'n*, 2013 UT 38, ¶ 48, 308 P.3d 461.

¶26　Here, Watson entered Toddler's home and immediately came upon an unexpected medical emergency. Toddler was covered in excrement that could have had life-threatening consequences if it entered her tracheotomy tube. Immediately, Watson picked up Toddler, who weighed 25 pounds, and rushed up a flight of stairs to a bathroom to clean her off. Toddler's syndrome, which caused her body to be twisted, made the act of carrying Toddler much more difficult than that of carrying a toddler who did not suffer from the syndrome. Making matters worse, Toddler was covered in excrement, which made her slippery. Once in the bathroom, Watson had to sidestep into an area about 18 inches wide between the toilet and the bathtub to place Toddler in the bathtub. Watson injured her neck when she, holding Toddler, extended her arms out while simultaneously attempting to keep excrement from entering Toddler's tracheotomy tube, keeping from dropping her, and finding the showerhead.

¶27　With the totality of the circumstances surrounding Watson's injury in mind, we next determine whether Watson's exertions and the surrounding circumstances were objectively unusual or extraordinary. Of course, the medical crisis that Watson confronted was well beyond what is ordinarily confronted in everyday life. Few people outside the nursing profession would ever be called upon to deal with such an emergency. But Horizon argues that Watson's exertions were not unusual or extraordinary for purposes of *Allen* analysis because they "are similar to pausing while lowering a box, tire, baggage, pot roast, or small child, then quickly turning one's head such as to respond to a ringing telephone, oncoming traffic, other passengers on the train, a cooking timer on the counter, or other children in the room." Horizon contends that "the only intense exertion to be analyzed in this matter is the quick movement of the head" while lowering an object weighing 25 pounds, and not the exigent circumstances Watson faced. Horizon essentially asks us to abandon the requirement to consider the *totality* of the circumstances that led to Watson's injury, which would be contrary to our case law. *See Murray*, 2013 UT 38, ¶ 47 ("[O]ur

decision in *Allen* ultimately considered the totality of the circumstances, including the employee's exertions and the workplace conditions.").

¶28　"Utah courts have deemed employment activities to be 'unusual' or 'extraordinary' when they require an employee to endure jumping, lifting great weight, or repetition." *Id.* ¶ 51. Here, Watson's injury involved lifting an amount of weight—25 pounds to be exact—that on its own would not typically satisfy the heightened standard. *See Allen*, 729 P.2d at 26 n.8 ("The usual wear and tear of life . . . certainly includes lifting objects weighing 20 pounds such as bags of golf clubs, minnow pails, and step ladders.") (quotation simplified). The weight itself is not the end of the analysis, however, as we must determine whether, under the totality of the circumstances facing Watson, her exertions were unusual or extraordinary.

¶29　Two of our previous cases where we have held the actions of the employee to be unusual or extraordinary are instructive here. First, in *Peterson v. Labor Commission*, 2016 UT App 12, 367 P.3d 569, Peterson was injured when she was twisting around and "reaching with her right arm to remove a [16-pound] tray of cakes from a rack located directly behind her work table . . . positioned about shoulder-height on the rack." *Id.* ¶ 3. We held that this injury resulted from an unusual and extraordinary exertion due to the "awkward manner that Peterson lifted" the otherwise insignificant amount of weight. *Id.* ¶ 15. Second, in *Oceguera v. Labor Commission*, 2020 UT App 83, 468 P.3d 544, Oceguera suffered a knee injury while she was rushing from sewing table to sewing table when her foot slipped off a foot pedal, which "had no grip tape and was covered by a stray piece of cloth," after she applied "significant pressure." *Id.* ¶ 23. We held that while "ordinary people in non-employment life sometimes find it necessary to depress foot pedals using 'significant pressure,' and sometimes find it necessary to hurry[,] . . . most people do not encounter those things very often in non-employment life, especially at the same time." *Id.* ¶ 24. We explained that "the unanticipated manner in which her foot

slipped off of the pedal," due to the stray piece of cloth on the pedal with no grip tape, was the "most significant" piece of evidence and that "[e]ncountering a pedal with those characteristics was unusual and extraordinary." *Id.* ¶ 25.

¶30 Considering the totality of the circumstances that led to Watson's injury, we have no difficulty concluding that her exertions were at least as unusual or extraordinary as the circumstances in these cases. Although 25 pounds is not an unusual amount of weight for an adult to carry, the medical emergency Watson faced and the awkward way in which Watson had to hold Toddler, in such a small space, rendered the action objectively unusual or extraordinary, and not something we would expect of people in typical nonemployment life. The extraordinariness of the situation was magnified by Toddler's body being twisted as a result of a debilitating syndrome and slippery due to being covered with excrement, and by Watson having to look up for the showerhead all the while being careful not to drop Toddler or allow excrement into her tracheotomy tube. Watson's exertions, therefore, were at least as unusual and awkward as those in *Peterson*, where the worker was twisting while reaching for a 16-pound tray of cakes, and were certainly performed under far more strenuous and consequential circumstances because if Watson dropped what she was holding, a child could have died, whereas in *Peterson* only a few cakes would have been ruined. And while Watson's exertions may be superficially similar to "lowering a box, tire, baggage, pot roast, or small child, then quickly turning one's head such as to respond to a ringing telephone, oncoming traffic, other passengers on the train, a cooking timer on the counter, or other children in the room" as Horizon suggests, the exigency of the circumstances Watson confronted takes it well beyond these normal activities.

¶31 In doing these normal activities, people are not often in such an unusual and extraordinary position as the one Watson was in, having to hold the object out in front of her in a cramped space while the object is slippery and difficult to hold and then

having to look around, all the while knowing if the object is dropped catastrophic, life-threatening consequences would follow. *See JBS USA v. Labor Comm'n*, 2020 UT App 86, ¶¶ 3, 16, 18–19, 467 P.3d 905 (holding that the employee's act of "jumping away from [a burning semi-truck] at a height of approximately 40 inches" constituted "exigent circumstances" that made the exertion unusual or extraordinary). Again, *Oceguera* is instructive. There, the employee was undertaking actions that people do in everyday life—depressing foot pedals and hurrying—but she was doing both of those actions in a rushed manner and then was presented with an unexpected circumstance—a slippery foot pedal. Likewise, we expect people in everyday life to deal with carrying objects weighing 25 pounds and having to simultaneously look around. But we do not expect people in everyday nonemployment life to have to carry medically fragile human beings of such weight while dealing with the extraordinary circumstances Watson faced. As in *Oceguera*, Watson was presented with an unanticipated situation while in a hurry, and while under circumstances that were more fraught than those in *Oceguera. See American Roofing Co. v. Industrial Comm'n*, 752 P.2d 912, 915 (Utah Ct. App. 1988) (holding that "the weight, *together with the manner* in which [the employee] lifted the bucket and the fact that the bucket snagged, combined to characterize [the] action as unusual or extraordinary") (emphasis added).[6]

---

6. At the conclusion of briefing, Horizon called our attention to *White v. Labor Commission*, 2020 UT App 128, 474 P.3d 493. This decision does not require a different result. In *White*, the employee was injured while "walking backward, focused on a task other than the mere act of walking, and then stumbling on a protruding object, shifting his weight, and stabilizing himself." *Id.* ¶ 22. We held that this activity was not unusual or extraordinary because "[p]eople in everyday life are generally expected to multitask while walking and to steady themselves when stumbling on something unexpected in their path." *Id.* In

(continued…)

¶32   Based on the totality of the circumstances and our case law, we conclude that Watson's "employment contributed something substantial to increase the risk [she] already faced in everyday life because of [her pre-existing] condition," *See Allen*, 729 P.2d at 25, and she was therefore entitled to an award of temporary total disability benefits and medical expenses.

CONCLUSION

¶33   Substantial evidence supported the Commission's determination that Watson did not satisfy all the required statutory elements to be awarded permanent total disability. The Commission correctly determined that Watson satisfied the heightened *Allen* standard of legal causation to be awarded other benefits, however, and substantial evidence supported its factual determinations underlying that determination. Therefore, we decline to disturb the Commission's order.

——————

(…continued)
contrast, we do not expect people in everyday life to deal with exertions like those undertaken by Watson, as previously detailed.